# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF EASTERN PENNSYLVANIA
### PHILADELPHIA DIVISION

```
IN RE:                         )  Case No. 18-12944-jkf
                               )  Chapter 13
                               )
                               )  Courtroom 3
NORIS SANTIAGO,                )  Robert N.C. Nix, Sr.
                               )  Federal Courthouse
                               )  900 Market Street
                               )  Philadelphia, Pennsylvania
              Debtor.          )
                               )  May 14, 2018
                               )  2:04 p.m.
```

TRANSCRIPT OF EXPEDITED MOTION FOR RELIEF FROM STAY/EXPEDITED
MOTION OF BARBARA WOLF FOR AN ORDER GRANTING RELIEF FROM
AUTOMATIC STAY UNDER 11 U.S. CAPITAL, SECTION 362; MOTION TO
DISMISS DEBTOR AS BAD FAITH FILING AND FOR EXPEDITED REVIEW
PURSUANT TO LOCAL RULE 5070-1(G) BY CITY OF PHILADELPHIA
BEFORE HONORABLE JEAN K. FitzSIMON
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

```
For the Debtor:        Law Offices of David A. Scholl
                       By:  DAVID A. SCHOLL, ESQ.
                       512 Hoffman Street
                       Philadelphia, Pennsylvania 19148

For the City           City of Philadelphia
of Philadelphia:       By:  PAMELA ELCHERT THURMOND, ESQ.
                       1401 JFK Boulevard, Room 580
                       Philadelphia, Pennsylvania 19102

Electronic Court Recorder: CHRISTINA JACKSON
```

**Transcription Service:**        **TRANSCRIPTS PLUS, INC.**
**435 Riverview Circle**
**New Hope, Pennsylvania 18938**
**Telephone: 215-862-1115**
**Facsimile: 215-862-6639**
**e-mail CourtTranscripts@aol.com**

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

2

APPEARANCES:
(continued)

For Barbara Wolf:          Bielli & Klauder, LLC
                           By:  NELLA BLOOM, ESQ.
                                THOMAS BIELLI, ESQ.
                           1500 Walnut Street, Suite 900
                           Philadelphia, Pennsylvania 19102

INDEX

WITNESSES                                                    PAGE

RANDAL BARON
 Direct Examination by Ms. Thurmond                           16
 Cross-Examination by Mr. Scholl                              26
 Cross-Examination by Ms. Bloom                               31
 Redirect Examination by Ms. Thurmond                         33

THOMAS RYBAKOWSKI
 Direct Examination by Ms. Thurmond                           35
 Cross-Examination by Ms. Bloom                               54
 Cross-Examination by Mr. Scholl                              55
 Redirect Examination by Ms. Thurmond                         60

NORIS SANTIAGO
 Direct Examination by Ms. Thurmond                           66
 Cross-Examination by Mr. Scholl                              84
 Redirect Examination by Ms. Thurmond                         87

CITY OF PHILADELPHIA'S EXHIBITS                    ID   EVID

2    Pictures                                      38    90
3    Complaint action of Number 2070               40    90
4    Court order (2/24/11)                         42    90
5    Document                                      43    90
6    2012 complaints                               44    90
7    Court order (1/22/2013)                       47    90
8    Court order (11/2/2012)                       23    90
9    2016 equity action by the City               47    90
10   Order (2/2/2016 should be 2017)               47    90
11   Order (4/13/2017)                             48    90
17   Schedule A/B                                  72    90
18   Schedule I/J                                  78    90
19   Plan                                          80    90
22   Order (11/1/12)                               48    90
23   Water Revenue Bureau claim                    60    90
24   Water Revenue Bureau claim                    61    90
25   City of Philadelphia claim                    61    90
28   Decision letter from application              19    90
27   Approvals                                     20    90

4

1          THE CLERK:  Good afternoon.  This is Judge

2  FitzSimon's 2 o'clock list for May the 14th.  The matter is

3  Noris Santiago, the expedite motion for relief filed by Barbara

4  Wolf, and the motion to dismiss as bad faith filing filed by

5  the City of Philadelphia.

6          Could counsels make their appearances?

7          MR. SCHOLL:  Yes, I'm David Scholl for the debtor.

8  Is it possible that I could have one of the hearing devices?

9          THE COURT:  Certainly, yes.  Now we just have to

10  figure out which one works.

11                (Laughter/Pause/Testing Devices)

12          THE COURT:  We apparently have a winner.  Can you

13  hear me, Mr. Scholl?

14          MR. SCHOLL:  Yes.  I could probably hear you without

15  it, I can hear you better, yes.

16          THE COURT:  All right.  Excellent.

17          MS. THURMOND:  Pamela Thurmond on behalf of the City

18  of Philadelphia.

19          MR. BIELLI:  Thomas Bielli and Nella Bloom on behalf

20  of Barbara Wolf; good afternoon, Your Honor.

21          THE COURT:  Good afternoon; all right.

22          What are we taking first?  I will ask the City since

23  they're involved in both motions.

24          MS. THURMOND:  I think I had spoken with Mr. Bielli,

25  and I think we would take the motion to dismiss first because

5

1  if granted, it would moot out the motion for relief.

2         But I do think, Your Honor, that there could be a

3  combined evidentiary record.

4         THE COURT:  Any objection to that, Mr. Scholl?

5         MR. SCHOLL:  No, Your Honor.

6         THE COURT:  All right; very good.

7         Do you want to at least make openings on the motion -

8  - on the motion to dismiss?

9         MS. THURMOND:  Very good, Your Honor.

10        As an initial matter, Your Honor, thank you for -- to

11 the Court for agreeing to hear us on this expedited basis.  The

12 Court seeks to -- the City seeks to dismiss this debtor's case

13 as a bad faith filing.  This case is really about the debtor

14 and her husband, and their 15-year history of failed promises

15 to the City about fixing the property at 1601 Mount Vernon

16 Street.

17        The debtor chose to file bankruptcy in the middle of

18 a conservatorship petition proceeding in State Court in which

19 the City is an interested party.  The conservator, if

20 appointed, would make the necessary repairs to the property and

21 restore it to its historical significance.

22        The debtor jointly owns the subject property with her

23 husband.  And the subject -- and the property is really

24 concerning for the City because it's in a high foot traffic

25 area, it's in the next block from a high school.  It's a few

6

1   blocks away from a neighborhood park and playground.  We are

2   concerned that the property has been designated by L&I as

3   unsafe, and it's deteriorating.

4          The City believes the debtor filed this bankruptcy

5   case to hinder and delay the conservatorship trial and the

6   City's more than a decade fight to preserve this historic

7   property.  The debtor incredibly has been fined in State Court

8   at least three times by the Philadelphia Court of Pleas with

9   respect to this property.  There was a -- fines issued in 2012

10  and 2013, both in the amount of $100,000.  And in April of

11  2017, the State Court issued a $25 a day fine from June 12th,

12  2017 for every day the violations and the documentation was not

13  provided.

14         The City -- I know Your Honor -- I don't know how

15  much Your Honor will be able to hear today, but the City

16  intends to call three witnesses:

17         First, Randal Baron from the Philadelphia Historical

18  Commission.  He will testify about the property being in the

19  Spring Garden Historical District since 2000 -- just since

20  2000.  And that the significance of this property, both as

21  being as part of the District and also as being the property

22  that was owned by a Robert Purvis who resided in the property

23  for a number of years, and he is known as the President of the

24  Underground Railroad in Philadelphia, was the leading order and

25  supporter of getting rid of slavery.

7

1          In 2003, the debtor and her husband presented the

2  Philadelphia Historical Commission with a proposal for

3  essentially the complete rehabilitation of this property.   That

4  -- it would have included a multi unit building.   That was

5  approved by the Philadelphia Historical Commission, but it's

6  never come to fruition.

7          Throughout the years, the Philadelphia Historical

8  Commission worked with the Santiagos to approve seven different

9  applications for work on the property, most of which was never

10 completed.   In 2012, the Philadelphia Historical Commission

11 approved the immediate removal of the rear portion of the

12 property.   There had been a partial collapse of the rear

13 portion of the property, and then with the L&I in connection

14 with the Philadelphia Historical Commission immediately with

15 court permission removed the real portion of the building to

16 prevent injury to the public.   That was with the proviso that

17 the defendants were to restore the historical features of the

18 rear portion of the building within one year; that has not

19 happened.

20          And finally Mr. Baron will testify the Philadelphia

21 Historical Commission is desirable of the repair of the subject

22 property and the restoration of it to a historical

23 significance.   And we think the conservatorship is a way for

24 that to happen after many, many years of trying to get the

25 Santiagos to do that.

1          Next we have a Thomas Rybakowski who is an L&I

2  inspector.  He will testify as to the different classifications

3  used by L&I, and that the property is currently unsafe, about

4  the history of the City's enforcement actions against the

5  property, and his concerns about what the current state of the

6  property is, and his concerns about that.

7          And finally the City will call Matthew Burton

8  (phonetic) who will testify as to the City's proofs of claim

9  that are filed in this current case.

10          THE COURT:  So that's someone on behalf of the City,

11  all right, thank you; okay.

12          MS. BLOOM:  Good afternoon, Your Honor.  Nella Bloom

13  of Bielli & Klauder here on behalf of Barbara Wolf the movant

14  in this matter, and also the petitioner in the conservatorship

15  matter, captioned City -- excuse me -- Wolf versus Santiago,

16  January Term 2018, Number 4225.

17          Your Honor, at this point, would you like us to

18  present an opening argument now, or --

19          THE COURT:  I only want to hear about the motion to

20  dismiss right now.  So if you've got something to add to what

21  Ms. Thurmond had to say, I will gladly hear it.  If you don't,

22  I'll hear from Mr. Scholl.

23          MS. BLOOM:  Thank you, Your Honor.  The only thing

24  that we would add is that we did file a joinder to the City of

25  Philadelphia's motion regarding our request for a three-year

1  bar.  The three-year bar in this case, given the extensive

2  history of litigation relating to the property, and the --

3  since 2009, at least, and given the fact that the debtor has

4  previously filed a bankruptcy case, and that case was -- after

5  confirmation was dismissed for failure to file -- pardon me --

6  to make plan payments, it is our position that a bar would be

7  in the best interest of not only -- not only the City of

8  Philadelphia, not only the conservator -- excuse me -- the

9  petitioner, but also third parties and stakeholders in the

10  community because a bar would permit the conservator, if

11  appointed, to actually fulfill the duties of conservatorship to

12  have the property be -- the conditions of the property be

13  abated, have the property be properly -- essentially returned

14  to active use, and to have the historic qualities of the

15  property preserved.

16          Thank you.

17          THE COURT:  Thank you.  Okay.

18          MR. SCHOLL:  Well --

19          THE COURT:  Mr. Scholl?

20          MR. SCHOLL:  Yes, Your Honor.  Your Honor, I -- I

21  filed this -- it looked like a typical Chapter 13 case, nice

22  little case, one prior filing.  And I might add what happened

23  in the prior filing, there was nothing filed by the City in the

24  entire case, and it existed for several years.  And not only

25  that, the debtors made significant payment.  They paid over

1   $50,000 to the City during the course of the case.

2          And, yes, it was ultimately dismissed, but it wasn't

3   as if the debtors were, from the outset, not making payments,

4   they made their payments for a considerable time.  And, of

5   course, we did file a motion to extend the stay, and we

6   explained what had happened there.  The debtor thought that

7   they had a resolution, and that they didn't need the bankruptcy

8   anymore, and they decided not to continue to make the payments,

9   but that's all that happened.

10         It is somewhat surprising when we're talking about a

11  historical building -- and incidentally, my clients bought this

12  building in 1977.  Nobody said anything about this being a

13  historical building for -- I'm going to say -- 25, 30 years

14  that they owned it.  In fact, they ran cleaning -- cleaners

15  there.  Nobody ever said, hey, this is -- this property was

16  owned by somebody special, and this should be a historic

17  property, and there should be something done.

18         But -- so they -- there's been -- a lot of time

19  that's really gone by here.  Many, many years have gone by, and

20  the debtors in their last case, as I said, made considerable

21  payments.

22         And then now, at a point where they're attempting to

23  get financing to get a considerable loan that would be a high

24  amount of funds, and be able to actually improve this property

25  now, in accordance with what the historical society would wish,

1  as well as the City, but --

2           THE COURT:  Mr. Scholl, did I understand your

3  pleading?  I read your pleading to say that they had financing.

4           MR. SCHOLL:  Yes.  Well, they have a pre-commitment

5  for financing, it isn't finalized yet.  There's a number of

6  steps that have to be gone through to finalize financing,

7  particularly when there's the Historical Society involved, as

8  well as the City.  And the Santiagos are not -- while they are

9  homeowners, they are not wealthy people that have a lot of

10 funds that they can just pour into doing these items, but

11 they're trying their best to do it.  And, frankly, if there's a

12 conservator appointed, I don't see that they're going to be

13 able to do it any faster or any better than the Santiagos.

14          So why -- the conservator ship process is an unusual

15 process, it doesn't --

16          THE COURT:  Mr. Scholl, I'm not going to accept your

17 testimony on what that process is, so --

18          MR. SCHOLL:  Right.  Well,  you'll hear about that,

19 they'll tell you about that.

20          THE COURT:  I'm sure I will hear about it, but --

21          MR. SCHOLL:  But I -- I --

22          THE COURT:  I'm not looking for testimony from the

23 lawyers, as much as I love you all, and love to hear you talk.

24          MR. SCHOLL:  Well, the defenses that I stated -- I

25 mean first of all, I questioned whether Mr. Wolf, or any

12

1  neighborhood person that just thinks they don't like the

2  property down the street, can come in and just file something,

3  and get relief from the automatic stay to proceed with that.

4        THE COURT:  Well, I'm not proceeding on the relief

5  from the stay right now.

6        MR. SCHOLL:  Well --

7        THE COURT:  I'm only proceeding on the motion to

8  dismiss.

9        MR. SCHOLL:  Is their motion.  The City's motion to

10 dismiss.  Now -- I'm accustom to arguments that there's bad

11 faith filings.  But you really see it when it's only a second

12 filing, and when the prior filing was confirmed without any

13 objection by the same creditor that's been involved in this

14 process since the very beginning.  So it's a little -- it's

15 certainly not the norm to have that kind of a --

16       THE COURT:  Understood.  Mr. Scholl, what you're

17 going to have to demonstrate to me is that there's good reason

18 why, from at least 2012 on, your clients have failed to do

19 anything that they were required to do with this property.

20 That's what's going to have to -- you're going to have to show

21 me if they can, in fact, demonstrate to me that they've taken

22 adequate steps, right?

23       MR. SCHOLL:  Well, they will --

24       THE COURT:  That's -- that's the issue.

25       MR. SCHOLL:  They will be glad to --

13

1            THE COURT:  The issue is whether or not they've got a

2    case from the standpoint of danger to the public, historical

3    basis, and the fact that your clients have had ample

4    opportunity to do this, to demonstrate that they think that

5    this is a bad faith filing.

6            And what you then get to do is show me why all -- or

7    that the last six years they've been diligently working on this

8    done, right?

9            MR. SCHOLL:  Well, I --

10           THE COURT:  That's what I'm expecting to hear.

11           MR. SCHOLL:  I don't think it's a total of six years,

12   but, yes.  They understand that, and this is a building they've

13   put tremendous effort into, and they will continue to do that

14   because they understand that there's many aspects of this, the

15   historic aspect, the safety aspect.

16           But the only point I'd make is this:  There was a

17   long periods of time that have gone by here, and there's been

18   no action, neither the City's, not by the neighbors --

19           THE COURT:  And you know, and you can query them

20   about that all you want, and then I'll figure out --

21           MR. SCHOLL:  Well, I would.

22           THE COURT:  -- whether or not it matters to me, Mr.

23   Scholl.

24           Let me put it this way:  It's not the -- laches, when

25   you're talking about City activities, is a little different

 1  than it is when you're talking about private activity, the case

 2  law is pretty clear on that.

 3          So, you know, you're going to have to show me a lot,

 4  but I'm happy to hear it from you all.

 5          MR. SCHOLL:  All right.  Well, we'll present as best

 6  we can, Your Honor.

 7          THE COURT:  All right; very good.

 8          MR. SCHOLL:  All right.

 9          THE COURT:  Ms. Thurmond?

10          MS. THURMOND:  With that, Your Honor, the City would

11  call its first witness.

12          THE COURT:  Whoever that is from L&I, please come up.

13          THE CLERK:  You're going to leave your stuff here,

14  you can't take anything on the stand.

15          MR. BARON:  Here?

16          THE CLERK:  Yeah, you can leave it right here.

17          MR. BARON:  Not even this?

18          THE CLERK:  Not even this, no.

19          THE COURT:  Some see this nice lady, and she'll swear

20  you in, and then you'll get up in this box.

21          MS. THURMOND:  Go to Ms. Jackson, and she'll swear

22  you in.

23          THE COURT:  Over here, sir.

24          MS. THURMOND:  Oh, Ms. Jackson is --

25          MR. BARON:  Wrong place.

Baron                                15

1           MS. THURMOND:  Sorry.

2           THE COURT:  It's all right.

3           MS. THURMOND:  Your Honor, do you have a preference?

4   Do you want me to stand at counsel --

5           THE COURT:  She hasn't finished.  So -- but, no.

6           MS. THURMOND:  Oh, I'm sorry.

7           THE COURT:  You can -- you are more than welcome to

8   stay there with your papers.

9           RANDAL BARON, MOVANT'S WITNESS, SWORN

10          ELECTRONIC COURT RECORDER:  Give your name for the

11  record, and spell your last name, give your address.

12          THE WITNESS:  Randal Baron, B-A-R-O-N, 1326 Spruce

13  Street, Philadelphia, Pennsylvania 19107.

14          MS. THURMOND:  Your Honor, may I just make a

15  logistics note?  We --

16          THE COURT:  Were you guys able to agree on any facts

17  at all?  You guys stipulated to anything on this?

18          MS. THURMOND:  I -- in the interest of time, we have

19  not had fulsome discussions the debtor.

20          THE COURT:  All right.

21          MS. THURMOND:  We --

22          THE COURT:  So I'm sorry, go ahead and make the point

23  you were going to make.

24          MS. THURMOND:  We -- in the interest of efficiency,

25  we have put together exhibit binders, Your Honor has a copy,

Baron - Direct                                16

1   the witness has a copy, I've shared a copy with Mr. Scholl and

2   Mr. Bielli.

3           If I don't end up using an exhibit, or if Your Honor

4   sustains an objection on it, I will just, at the end of the

5   hearing, remove it.  But I just -- for convenience sake, I put

6   it in a binder.

7           THE COURT:  That's fine.

8                       DIRECT EXAMINATION

9   BY MS. THURMOND:

10  Q    Mr. Baron --

11  A    Yes.

12  Q    -- good afternoon.

13  A    Hello.

14  Q    Can you please state your employer?

15  A    City of Philadelphia, Philadelphia Historical Commission.

16  Q    And how long have you worked for the Philadelphia

17  Historical Commission?

18  A    34 years.

19  Q    And what is your title?

20  A    Preservation Planner III.

21  Q    And what are your primary responsibilities as a

22  Preservation Planner III?

23  A    Historic designation, and primarily design review.  So

24  when people want to alter, or demolish, or whatever, buildings

25  that are on the register, I help with the review.

Baron - Direct                                    17

1  Q    Okay.  Do you know what the Spring Garden Historical

2  District is?

3  A    Yes, I do.

4  Q    Can you explain to the Court what that is?

5  A    It's a historical district that was designated in 2000,

6  and it goes from approximately 15th Street to about 23rd Street

7  from Spring Garden to Fairmount, and it is a district that is

8  primarily Italianate style housing from the 1850's.

9  Q    And are there different categories of properties in this

10  District?

11  A    Yes.

12  Q    Can you explain to the Court --

13  A    The -- within any historic district, but including this

14  one, there are buildings that are non-contributing, such as the

15  gas station that's on Spring Garden Street, there are the

16  majority of the buildings which are typical 1850's row houses,

17  and then there are some buildings which I'll call significant

18  to the District because they have outstanding value, either

19  because of who lived there, or because they have a special

20  architecture, something like that.

21  Q    Mr. Baron, are you aware of the property at issue, 1601

22  Mount Vernon Street?

23  A    Yes, I am aware.

24  Q    Is that property within the Spring Garden Historical

25  District?

Baron - Direct                                    18

1  A    Yes, it is -- it is called significant within the Spring

2  Garden Historic District.

3  Q    And why -- when did you first become aware of the property

4  at 1601 Mount Vernon Street?

5  A    Well, when we're preparing the Historic District itself,

6  which was in the 1990's, and at the time of its designation in

7  2000, we were very aware of it.

8  Q    And why is the -- let me just call it the property.

9  A    Um.

10  Q    If I say "the property," you'll understand that I mean

11  1601 --

12  A    Yes.

13  Q    -- Mount Vernon Street?  Why is the property classified as

14  significant within the District?

15  A    The -- because Robert Purvis lived there, and Robert

16  Purvis was a very important abolitionist, and he wrote

17  extensively, he lobbied for abolition, and he was very involved

18  in freeing -- getting slaves from the south on their passage

19  northwards.

20  Q    Did Mr. Purvis use the property as a stop in the

21  underground railroad?

22  A    No, his -- he -- this property was a property that he

23  bought after the Civil War.  And -- but it -- he was there for

24  decades of his life, so --

25  Q    Mr. Baron, you have a binder in front of you -- you should

Baron - Direct                                    19

1  have a binder in front of you, it looks like --

2  A    I don't.

3           MS. THURMOND:  Oh.  Ms. Jackson, do you mind?

4           THE COURT:  We have -- we have it down there.

5           THE WITNESS:  Okay; thank you.

6  Q    Turn to Exhibit 28 with me.  Let me know when you're

7  there.

8           MS. THURMOND:  Ms. Jackson, can you hear me okay?  Do

9  you need me to go --

10 A    Yes.

11          MS. THURMOND:  Okay.

12          THE COURT:  She's getting it.

13 A    I do have it.

14 Q    Okay.  Can you take a look at this document and tell me

15 whether you're familiar with it?

16 A    Yes, this is the decision letter from an application when

17 the designer for the Santiagos came before the Historical

18 Commission to renovate the property, to demolish a portion at

19 the rear, and to build a three-story addition.

20 Q    Okay.  And when was this proposal made?

21 A    December -- the decision of meeting was December 12th,

22 2003.

23 Q    And what type of property was the Santiagos going to

24 develop in 2003?

25 A    Well, it was a -- a row house that had a store -- had at

Baron - Direct                                                20

1 one point had a store in the first floor, but it was empty at

2 the time that the proposal came in, and it was already in

3 fairly poor condition; missing windows, and so forth.  And the

4 Historical Commission was very eager to see it renovated and

5 did, in fact, approve the proposed work.

6 Q    And do you know what type of property the Santiagos were

7 going to put on that location?  Was it going to be a single-

8 family home, a commercial building?

9 A    It was going to be multiple residential units, and there

10 was going to be parking garages for multiple cars for the

11 different units.

12 Q    Do you know if this renovation ever took place?

13 A    It did not, although the garage portion was demolished

14 early on, but the rest -- but the actual development did not

15 occur.

16 Q    Can you flip one more back and go to Exhibit City 27?

17 A    Yes.

18 Q    And this is -- I'll just tell you -- is a composite

19 exhibit of several different documents.  Can you just flip

20 through the several pages, and let me know if you're familiar

21 with these documents?

22 A    Yes, I am.

23 Q    Can you tell the Court what these documents are.

24 A    So at various times, the -- although the major work was

25 not done, there were violations that were issued because the

Baron - Direct                                    21

1  building continued to deteriorate.  At various points, we

2  received applications to do pieces of work, sort of subsets of

3  the larger worker.  And we approved at various times windows,

4  doors, cornice, roofing, shoring up walls.  So these are --

5  these are approvals which the Historical Commission stamped

6  approval for to do those pieces of work.

7  Q    All right.  I'm not going to take you through each one,

8  but let's just take the first one which I believe are the first

9  two pages of the document of the Exhibit 27.  Why don't you

10 tell me what work was sought to be done?

11 A    Well, the one in 2007 here is for windows, doors, cornice,

12 woodwork, masonry work, and roofing work.

13 Q    And do you know whether that work was done?

14 A    That work was not done at that time.

15 Q    Okay.  And then let's go to the next one which is the next

16 two pages from April 3rd, 2009.

17 A    Shoring up of walls.  There was a point where there was

18 some wood that was installed to help shore up some walls.

19 Ultimately that only lasted a certain amount of time, but there

20 was some of that.

21 Q    And the next one occurred 6/6/2009, can you tell me what

22 that was for, and whether the work was done?

23 A    This is for roofing.  I do think there was some roofing

24 done at some point, but because of the flat roof, I can't tell

25 you whether it was or it wasn't.

Baron - Direct                                    22

1  Q    Okay.  What about the one for 6/24/2010?

2  A    That one was for masonry work, doors, windows, cornice;

3  that was not done.

4  Q    And then for 2/3 -- or for February 3rd, 2011, the next

5  two pages.

6  A    That was for demolition of a portion of wall, and

7  rebuilding area and salvage brick; that one was not done.  Add

8  new windows, also not done.

9  Q    Okay.  And then just skipping ahead to the last one, which

10 is -- it doesn't have a date, at least on the first page, but

11 it does say new cornice to note and match 1603 Mount Vernon

12 Street.

13 A    Yes, that one the cornice was -- has still, to this day

14 not been done.

15 Q    Okay.  So the property to this day does not have a

16 cornice.

17 A    It does not.

18 Q    Did there come a time when a portion of the property was

19 taken down or demolished?

20 A    Yes, there was a court case and at the -- the resolution

21 of that particular court case, Judge Moss (phonetic) ordered

22 that the rear portion of the property, the rear L could be

23 demolished, but with the proviso that it be rebuilt within one

24 year.

25 Q    All right.  Can you turn to Exhibit City 8?  Let me know

Baron - Direct                                        23

1  when you're there.

2  A    Yes, I'm there.

3  Q    Is this the court order that you were referencing just now

4  regarding the demolition of the rear portion, or the rear L of

5  the property?

6  A    Yes.

7  Q    Okay.

8  A    This is from 2012.

9  Q    Yes.  When's the last time -- and why did the Philadelphia

10 Historical Commission approve the removal of the rear half of

11 the building at that time in 2012?

12 A    Well, the Licenses & Inspections was very concerned that

13 that portion had become a real danger, and it seemed that even

14 after all of the attempts to get the owner to repair it, it was

15 not done.  So the City came to the point where they said this

16 must be done because of the imminent danger, and so it -- by

17 allowing that portion to come down, we were able to save the

18 part that was still safe enough to remain.

19 Q    When is the last time you visited the property?

20 A    I was there in April, I think, the 17th.

21 Q    Of this year.

22 A    Of this year, um-hum.

23 Q    And what was the condition of the property at the time of

24 your visit?

25 A    The property has -- the portion where the rear was

Baron - Direct                                    24

1  demolished has a temporary wall that is, to extent, peeling

2  away.  There is a -- there is a piece in the back of the

3  building that is essentially a troth for water because there

4  was the former basement of the rear L.  There is a lot of

5  masonry damage.  Because the cornice is missing, water streams

6  down the wall, and so that allows the water to get into the

7  bricks.  And then when it freezes, that causes the face of the

8  bricks to start to spall off.  It has open windows on the side

9  facing 16th Street, and water can get in there.  And -- so

10 generally I would say it's in a condition that a person looking

11 at it would say it's an eyesore.

12 Q    What does the Philadelphia Historical Commission want for

13 this property?  Or what would you like to see happen with this

14 property?

15 A    We would like to see the property renovated, and brought

16 back to use.  We would like to see the brickwork repaired, the

17 windows installed, the cornice put back, the rear L rebuilt per

18 the court order.

19 Q    Is -- is the Philadelphia Historical Commission asking for

20 this to be turned into some kind of museum, or --

21 A    No

22 Q    -- or something like that?

23 A    No, in fact, the Historical Commission approved a proposal

24 for Mr. Santiago that was far from a museum by including an

25 addition, and garages, and so forth.  The whole idea was to

Baron - Direct                                    25

1  make it a -- something that could be profitable, and where the

2  use would help pay for the renovations.

3  Q    All right.  So the -- a proposal that you're acknowledging

4  is from the 2003 proposal, is that correct?

5  A    Correct.

6  Q    And that would have -- the Santiagos, if they would have

7  done the work, would have built private housing?

8  A    Exactly.

9  Q    Okay.

10  A    And this is an area with a great deal of housing demand,

11  so it wouldn't be difficult to get people to --

12  Q    Are aware of the conservator ship petition and action that

13  was proceeding in State Court prior to this bankruptcy filing?

14  A    I am aware of it, yes.

15  Q    What is the Philadelphia Historical Commission's petition

16  -- position as to the appointment of a conservator?  Are you --

17  A    Well, I think that it -- we have seen conservatorships be

18  successful on a number of properties in the City to actually

19  renovate the buildings and make them safe, and brought back to

20  useful life.  So in my opinion, it is a way to preserve the

21  building, and to make the neighborhood sort of whole, and keep

22  people safe.

23          MS. THURMOND:  I have nothing further.

24          THE COURT:  Okay.

25                          CROSS-EXAMINATION

Baron - Cross/Scholl                        26

1 BY MR. SCHOLL:

2 Q    As far as the historical significance of the building,

3 when did the historical society first indicate that there was

4 historical aspects to this building?

5 A    Well, first I'd like to say that I don't work for the

6 Historical Society, that is a private nonprofit that preserves

7 papers, and dresses, and materials.  Historical Commission is a

8 part of City Government, and the Historical Commission

9 designated the building in 2000.

10 Q    2000, okay.  And is there some reason that there was no

11 activity or no designation prior to that time?

12 A    The Historical Commission has been designating properties

13 for many, many years.  And the Commission actually has a

14 relatively small staff, but there are many, many neighborhoods

15 that are very historic that don't yet have historic districts.

16 For instance, Germantown, which is a very ancient section of

17 this City.  And actually 2000 is relatively early from the

18 standpoint of the City's actions for creating a historic

19 district.

20 Q    Okay.  Now you mentioned that there was various work that

21 was supposed to be done to the building on several occasions,

22 it was part of your Exhibit 28, I believe.

23 A    But --

24 Q    And then I think you were saying that the work had not

25 been done.  Now on what basis are you saying that that work was

Baron - Cross/Scholl                          27

1 not done?

2 A    Well, for example, the -- the work to the rear L to put in

3 windows, to make it safe, to work on that wall was never done

4 to the extent that the City found that it had to come down.  So

5 that was -- repairing that rear L was part of the 2003

6 application, and it was not -- it was not done and, therefore,

7 it came down.

8         The -- when I visited the building in April of this

9 year, it is still missing windows on the sides of the building,

10 the brick -- the brick is still in very poor condition, the

11 cornice is still missing.  So my -- my basis of it is looking

12 with my own eyes.

13 Q    All right.  How many times have you been to the building

14 since 2003?

15 A    Many times.  Many times.  I mean we work in the historic

16 district -- for instance, that whole block, there's been

17 renovations to nearly every building on the block.  And by

18 going to look at those renovations, and actually go by this

19 building on the way.

20 Q    All right.  And I think you're agreeing that the building

21 -- it's not practical, nor is anybody planning to build a

22 museum there or anything of that nature.  I think --

23 A    Well, I haven't -- I haven't heard of anybody planning to

24 build a museum.  But in general, I think that the funds for

25 creating new museums are in very short supply in the whole

Baron - Cross/Scholl                          28

1  country, and so the best bet for getting something renovated is

2  private investment.

3  Q    Right.  I think you -- you believe that the best

4  development of this property is as residential housing, is that

5  right?

6  A    Well, if one didn't have to concern one's self with

7  finances, I think it would be a wonderful thing to tell the

8  story of Robert Purvis in this house, but I think it's

9  impractical.  So I think that considering the practical

10  realities, I think that housing is the most likely of source of

11  use and income for this property.

12  Q    Right.  You never told the Santiagos that housing was not

13  a suitable development of this property, did you?

14  A    We never said that, no.

15  Q    All right.  So even --

16  A    In fact, we approved -- we approved housing.

17  Q    Even today, that would be an acceptable development of

18  this property, is that right?

19  A    Yes.

20  Q    And is there some reason that you believe that a

21  conservatorship would be superior to the Santiagos actually

22  doing it themselves?

23  A    Well, I think that the Santiagos have had a very large

24  number of years to renovate it, and I'm aware of even many

25  people who have tried to partner with Mr. Santiago in

Baron - Cross/Scholl                                    29

1  development, and have been rebuffed over the many, many years.

2  So I think that just the actualities of what has not happened

3  would seem to tell us that it's unlikely that the Santiagos are

4  going to do a development there.

5  Q    But I suppose if they presented to you evidence that they

6  were prepared to begin, even now, that would be satisfactory to

7  you, would it not?

8  A    Well, I would -- I've seen evidence that they intended to

9  do something over many.  They hired a designer, they came to

10 the Commission, they applied for permits, but they ultimately

11 did not follow through.

12 Q    Okay.  But if they'd be prepared to follow through at this

13 point, then their continued position would be acceptable, is

14 that right?

15       MS. THURMOND:  Your Honor, I think this calls for

16 speculation about what --

17       THE COURT:  It is pretty speculative, Mr. Scholl.  I

18 don't think it helps you actually, I think it hurts you.

19       MR. SCHOLL:  Okay.

20       THE COURT:  The answer is they have been given lots

21 of opportunities, and they haven't shown anything.  So the real

22 answer to your question is no, I just don't believe that they

23 would do it, even if they came that way.

24       So I don't think --

25       MR. SCHOLL:  All right.

Baron - Cross/Scholl                                    30

1           THE COURT:  I think if you beat this horse, that's

2  the answer you're going to get, and you're not going to like

3  it.

4           MR. SCHOLL:  Perhaps, Your Honor.  I'm not -- I'm not

5  that familiar with the witness or the evidence, so just trying

6  to learn.  All right.

7           Can you hold on just a second, please?

8                         (Pause)

9  BY MR. SCHOLL:

10 Q   Isn't it true that the Santiagos were making considerable

11 improvements to the property until the wall collapsed?

12 A   I'm not aware of these improvements.  The -- the one, I

13 would say, visible thing that was done were, I think, six

14 windows on the front facade.  Other than that, I'm not aware of

15 any improvements that they have done over the years.

16 Q   Are you aware that the Santiagos believe that the walls --

17 the building should be completely torn down when they were

18 partially torn down?

19          MR. SANTIAGO:  Because of most damage --

20 A   I -- I believe that the Santiagos would like the entire

21 building to be demolished.

22 Q   Pardon?

23          MR. SANTIAGO:  Because it's going to fall, that's

24 why.

25 A   They have asked --

Baron - Cross/Scholl                              31

1           MS. THURMOND:  Can we --

2  A    They have, in fact, said that they would like to see it

3  demolished.

4  Q    Right.  They did tell you that.

5  A    Yes, I heard them say that, yes.  I've heard Mr. Santiago

6  say that.

7  Q    Right, and that could have furthered development of the

8  property, wouldn't it?

9  A    It would have completely removed the historic character of

10 the -- of the building.  It would have -- it would have

11 destroyed the historic building, that's what it would have

12 done.

13 Q    All right.

14          MR. SCHOLL:  I have no further questions; thank you.

15          THE COURT:  All right.  Redirect?

16          MS. BLOOM:  Your Honor, may I?

17          THE COURT:  On redirect or not?

18          MS. BLOOM:  Not on redirect, on direct.

19          THE COURT:  Okay.  You guys didn't stand up before, I

20 didn't think you were interested.  Go ahead.

21          MS. BLOOM:  My apologies, Your Honor.

22          THE COURT:  That's all right.

23                        CROSS-EXAMINATION

24 BY MS. BLOOM:

25 Q    I only have a very few questions for you, Your Honor.  My

Baron - Cross/Bloom                                        32

1  first question is you had testified earlier that the entire

2  neighborhood was -- the entire Spring Garden neighborhood was

3  designated an historic neighborhood in approximately 2000, is

4  that correct?

5  A    Correct.

6  Q    Yes.  Would that make a difference as to whether an

7  existing owner of property within that neighborhood would need

8  to adhere to the -- to any different requirements in terms of

9  development?  If there was an existing owner, would they then

10 be exempt?

11 A    Yes, the -- the Historic Preservation Ordinance

12 specifically says that an owner must keep a historic property

13 in good repair, such that it's not demolished by neglect.

14 There's a whole section of the ordinance on that.  As well,

15 Licenses & Inspections has their own separate ordinances that

16 are about the like and so forth.  But, yes, there is something

17 separate in the Historic Preservation Ordinance.

18 Q    Would you characterize this property currently to be in

19 good repair?

20 A    No, I would not.

21           MS. BLOOM:  Thank you very much.  Thank you, Your

22 Honor.

23           THE COURT:  Any redirect?  Recross?

24           MR. SCHOLL:  No, I have no recross.

25           THE COURT:  Okay.

1                        REDIRECT EXAMINATION

2  BY MS. THURMOND:

3  Q    Mr. Baron, why is the Philadelphia Historical Commission

4  not in favor of the demolition of the entire building at this

5  point?

6            MR. SCHOLL:  Your Honor, what are we proceeding now

7  on?  On what petition?

8            THE COURT:  She's redirect.

9            MR. SCHOLL:  Redirect?  I didn't have any recross.

10            THE COURT:  You don't get it until after the

11  redirect.  You can -- you want to cross on Ms. Bloom?

12            MR. SCHOLL:  No.  First -- first it was questions,

13  and then there was -- there was cross-examination, and then

14  there was some more questions, and now I didn't ask any further

15  questions.

16            THE COURT:  No, those are -- the question by Ms.

17  Bloom, now there's the redirect by Ms. Thurmond, and you will

18  get to then --

19            MR. SCHOLL:  Oh, all right.

20            THE COURT:   - have recross at that point, if you want

21  it.

22            MR. SCHOLL:  All right.

23  BY MS. THURMOND:

24  Q    Mr. Baron, in light of the moving, why don't I repeat my

25  question.  Why is the Philadelphia Historical Commission not in

Baron - Redirect                                    34

1   favor of the demolition of the entire building at this point?

2   A    Well, the Philadelphia City Council passed the ordinance,

3   the Preservation Ordinance in order that the City of

4   Philadelphia can preserve its historic monuments.  This is for

5   the education of the public, the values of the neighborhood,

6   and so -- and particularly when a building is considered

7   significant, it is an elevated level of significance.  And so

8   the Historical Commission wants to preserve the building to

9   further all of those values that are in the Historic

10  Preservation Ordinance.

11          MS. THURMOND:  I have nothing further.

12          MS. BLOOM:  Nothing.

13          MR. SCHOLL:  Nothing further, Your Honor.

14          THE COURT:  Nothing further.  You may step down, Mr.

15  Baron; thank you.

16          MR. BARON:  Should I leave this?

17          MS. THURMOND:  You --

18          THE COURT:  Yes, leave that right there.

19          MS. THURMOND:  Leave that there, but you may gather

20  your belongings.  Is the Court ready for me to call my next

21  witness?

22              (No audible response heard)

23          MS. THURMOND:  The City would call Thomas Rybakowski

24  to the stand.  Hopefully I pronounced your name correctly.

25          MR. RYBAKOWSKI:  That's okay, I'm used to it.

Rybakowski - Direct                        35

1          THE COURT:  Please come up and be sworn.  We'll

2    listen carefully and try to get it right.

3              THOMAS RYBAKOWSKI, MOVANT'S WITNESS, SWORN

4          ELECTRONIC COURT REPORTER:  State your name, spell

5    your last name, and give your address.

6          THE WITNESS:  Thomas Rybakowski, T H O M A S   R Y B A

7    K O W S K I, City of Philadelphia, Licenses & Inspections, 4718

8    Mercer, Philadelphia, P A.

9          ELECTRONIC COURT REPORTER:  Could you spell your last

10   name again?

11         THE WITNESS:  Sure, R Y B A K O W S K I.

12         ELECTRONIC COURT REPORTER:

13         THE WITNESS:  You're welcome.

14                       DIRECT EXAMINATION

15   BY MS. THURMOND:

16   Q    Good afternoon.  Can you please state your employer for

17   the record?

18   A    City of Philadelphia, License & Inspections.

19   Q    And I can call it L&I for short, is that okay with you?

20   A    That's what the shirt says.

21   Q    How long have you worked for L&I?

22   A    Approximately three and a half years.

23   Q    And what is your title with L&I?

24   A    Building Inspector.

25   Q    And as a building inspector with L&I, what are your

Rybakowski - Direct                                    36

1  primary responsibilities?

2  A    I'm assigned to the Contractual Services Unit.  We are

3  assigned the designation of properties unsafe and

4  eminently (sic) dangerous.

5  Q    Can you -- are you aware of whether L&I uses different

6  classifications to describe properties?

7  A    Yes, specifically in my unit, we declare properties unsafe

8  and eminently (sic) dangerous.

9  Q    So are there three classifications: safe; unsafe; and

10  eminently (sic) dangerous?

11  A    Yes.

12  Q    Okay.  I think we know what safe is, but can you tell us

13  what unsafe and imminently dangerous mean, at least with

14  respect to L&I?

15  A    Unsafe would be that it has some structural problems or

16  deficiencies with the structure.  And eminently dangerous is

17  just that, that it's going to pose a threat right then and

18  there, and that there's significant structural issues with the

19  property, and that it is eminently (sic) dangerous to the

20  public right then and there.

21  Q    So if a property was eminently (sic) dangerous, what are

22  the things that L&I would be concerned about?

23  A    We would be very concerned with a collapse happening

24  eminently (sic) right then, and at that moment in time.

25  Q    So you would be concerned about pedestrian and vehicular

Rybakowski - Direct                                37

1  traffic in a collapse?

2  A    The general public, and the occupants of the property at

3  that time, yes.

4  Q    Okay.  Are you aware of the property at issue at 1601

5  Mount Vernon Street?

6  A    Yes, very.

7  Q    Which you heard me speak with Mr. Baron, I'm just going to

8  call it the "property," is that okay with you?

9  A    That's fine.

10  Q    When did you first become aware of the property?

11  A    The first time I was made aware of it was before the court

12  case that was filed in 2016.

13  Q    Are you aware of who the owner of the property is?

14  A    Yes.

15  Q    And who are they?

16  A    Mr. Santiago and Mrs. Santiago.

17  Q    So Miguel and Noris Santiago?

18  A    Yes.

19  Q    And that would be Mr. Santiago, Senior, is that correct?

20  A    Correct.

21  Q    You said you became engaged -- became aware of this

22  property in light of the 2016 court case, which we'll get to.

23  But prior to that, did you review L&I's records with respect to

24  the property?

25  A    When we -- when I first became employed by L&I, we always

Rybakowski - Direct                                    38

1  knew about this property.  The property has a long list or a

2  long history with the Department, going back to when it was

3  partially demolished under a court order in 2012.

4          So -- and being that it's on North 16th Street, a lot

5  of our inspectors have seen the property, and have notated the

6  different conditions with it.  So it is on our radar a lot.

7  Q    Okay.  Can you explain to me, and to the Court, what's at

8  that property?  What kind of property is it?

9  A    The property is a residential property, it's three

10 stories.  It sits -- it's a corner property, it sits at the

11 corner of 16th and Mount Vernon.  It is directly across the

12 street from the parking lot of Franklin Learning Center.  It

13 has significant designation of unsafe at the moment.  At the

14 time, it was designated as eminently (sic) dangerous before the

15 partial demolition took place under a court order.

16 Q    All right.  You have a binder of exhibits in front of you.

17 A    Yes.

18 Q    Can you turn to Exhibit Number 2, and let me know when

19 you're there?

20 A    The pictures?

21 Q    Yes, the pictures.

22 A    Yes.

23 Q    First let me ask you, do you recognize these pictures?

24 A    Yes.

25 Q    Why do you recognize them?

Rybakowski - Direct                                     39

1  A     Because I took them.

2  Q     Okay.  When did you take them?

3  A     April 26th, 2018.

4  Q     And for what purpose did you take these pictures when you

5  were at the property on April 26th, 2016?

6  A     They were in conjunction with a court order with a

7  conservatorship hearing that was taking place at that time.  On

8  April 26th, I was to meet the conservatorship party, including

9  their engineer at the location, for an interior and exterior

10 inspection.

11 Q     Okay.  Do these photos fairly and accurately depict the

12 property at 1601 Mount Vernon Street as of the time you visited

13 on April 26th, 2018?

14 A     Yes.

15 Q     All right.  So I want you to go -- they're not numbered,

16 unfortunately -- but one, two, three, four -- five pictures in.

17 You'll see a picture of some men standing on a street corner,

18 do you see that?

19 A     Yes.

20 Q     Okay.  So are we looking at the front of the property in

21 this picture?

22 A     You're looking at the front of the property, specifically

23 heading north on that -- on this picture is 16th Street, and

24 the adjacent street with the historical designation sign is

25 Mount Vernon.

Rybakowski - Direct                              40

1  Q    Okay.  So from in front of the picture, it is Mount Vernon

2  going this way, and then it is North 16th Street going this way

3  on the side of the property --

4  A    Yes.

5  Q    -- is that --

6  A    Where -- where the utility pole is, that's North 16th

7  Street, and the historical designation sign is Mount Vernon.

8  Q    Okay.  We'll come back to the pictures, but you can stop

9  there for now.  Can you turn to -- give me one second --

10 Number 3 in the binder?  Let me know once you're there.

11 A    It's the complaint action of Number 2070.

12 Q    Um, I don't know what the numbers are, but it is a

13 complaint action dated February 9th, 2009.

14 A    Yes.

15 Q    Okay.  Are you familiar with this document?

16 A    Yes.

17 Q    Can you tell the Court what this document is?

18 A    It is a document dating from the term of 2009 where there

19 was a equity court case brought against the property owner of

20 1601 Mount Vernon for repairs that needed to be done to the

21 property.

22 Q    Were there active L&I violations at the time this

23 complaint was filed?

24 A    Yes.

25 Q    And what were those?

Rybakowski - Direct                                41

1  A    Those were the eminently (sic) dangerous condition of the

2  property for the known back L of the location.

3  Q    Okay.  So if you turn to -- again no page numbers -- but

4  do you see the paragraph numbers?  There's a Paragraph 10, and

5  then if you turn to the very next page, there are some things

6  in bold right above Paragraph 11, do you see that?

7  A    I'm sorry; no.  I'm -- I lost track.  Would you repeat

8  that, please?

9  Q    So I went -- it's a little bit hard because there's

10 multiple -- three, four, four, six -- seven pages in, and

11 there's bold font on the top of the page, and then there's the

12 Paragraph 11 going forward.  If you want, I could --

13          MS. THURMOND:  If the Court, would you allow me to

14 approach to help him be on the same page?

15          THE COURT:  You can.

16                   (Pause)

17 A    Okay; thank you.

18 Q    So looking at the bold face font, are these the L&I

19 violations that were listed at the time?

20 A    Yes.

21 Q    So front wall deteriorated, so that would have been with

22 respect to the front of the property?

23 A    Yes, the specific -- the three bullet points are PM307,

24 front wall bulge -- deteriorated, I'm sorry, excuse me.  PM307-

25 1-8, rear wall bulge.  And PM307-1-8, again, and that's

Rybakowski - Direct                            42

1  referencing the rear wall fracture.

2  Q    So when you talk about the rear wall, is that with respect

3  to what we've heard from Mr. Baron about the rear L or the rear

4  portion of the property?

5  A    Correct.

6  Q    Okay.  And what was L&I seeking as part of this 2009 case?

7  Court case.

8  A    We were seeking the repair of the property.

9  Q    And can you turn to Exhibit City 4?

10                         (Pause)

11 Q    Are you there?

12 A    Yes.

13 Q    Are you familiar with this document?

14 A    Yes.

15 Q    Can you tell the Court what this document is?

16 A    It's a court order that was issued on February 24th of

17 2011 during a court case that was -- that was heard for 1601

18 Mount Vernon.

19 Q    Were there certain things that, pursuant to this court

20 order, the Santiagos were to do with respect to the property?

21 A    Yes.

22 Q    And what were those?

23 A    On the bottom of the court order, Bullet Point Number 1,

24 on or before April 8th, 2011, the defendants shall complete all

25 work necessary to repair roof, stabilize exterior walls, close

Rybakowski - Direct                                          43

1  all window openings, and repair the interior flooring systems.

2  The next page has a series of other bullet points that need to

3  be done in accordance with this court order that was issued.

4  Q     Do you know subsequent to this February, 2011 order

5  whether that work was done?

6  A     Under the terms of the permit, there was some work that

7  was done, but not completed.

8  Q     Can you turn to Exhibit City 5?

9  A     Yes.

10 Q     Do you know what the final resolution of the 2009 court

11 case was?

12 A     2009, there was a order that was issued pursuant to that

13 case.  There was a order that was issued for a fine, issued to

14 the owner of 1601 Mount Vernon.

15 Q     And when you say the owner, you mean Mr. and Mrs.

16 Santiago?

17 A     Correct.

18 Q     And what was the amount of that fine?

19 A     That fine is issued at $100,000.

20 Q     Okay.  Do you know whether that $100,000 has been paid to

21 L&I?

22 A     Not that I'm aware of.

23 Q     Okay.  Can you turn to City Exhibit 6, please?

24 A     Yes.

25 Q     Are you familiar with this document?

Rybakowski - Direct                                    44

1  A    Yes.

2  Q    Can you tell what this -- the Court what this document is?

3  A    This is another court order issued to the owners for -- of

4  1601 Mount Vernon, a Mr. and Mrs. Santiago, spelling out

5  repairs or work that needs to be done to the property.

6  Q    And what were the violations of the property -- were there

7  violations issued by L&I at the time of this complaint?

8  A    Yes.

9  Q    And what were those violations?

10          MR. SCHOLL:  Well, Your Honor, he's just reading the

11 orders, I don't see this as helpful.  He wasn't even employed

12 by the -- at that time.  He said he's only employed for three

13 and a half years.  He's -- he's just running through the

14 orders.  I mean if they want to put on orders, I suppose they

15 can get them in maybe somehow, but I don't think through this

16 witness.

17          MS. THURMOND:  I mean I think he's a custodian of

18 records for L&I, I mean he said that he reviewed the L&I case

19 file at the time he took over the case in 2016.

20          THE COURT:  I don't think he said anything of the

21 sort.  He didn't say he was the custodian.

22          THE COURT:  He did say he reviewed the records, but

23 let's establish --

24          MR. SCHOLL:  Yeah.

25          THE COURT:  -- whether he's the custodian of the

Rybakowski - Direct                              45

1  records, Ms. Thurmond.

2            MS. THURMOND:  I'm -- I'm sorry, Your Honor.

3            THE COURT:  Let's establish whether he's the

4  custodian of records for L&I.

5  BY MS. THURMOND:

6  Q    Mr. -- are you -- in preparation -- when you took over

7  this case in 2016 with respect to this property, did you review

8  the records of L&I?

9  A    Yes, before we brought the equity court case in 2016 to

10 file, I have -- I have reviewed and also looked at all the

11 records referring to 1601 Mount Vernon.

12 Q    And does L&I keep files, either in paper or electronic,

13 with respect to certain properties?

14 A    Yes.

15 Q    And are those -- are you aware of how those files are kept

16 by L&I?

17 A    Yes, we have them in paper and electronic filing for

18 multiple properties.

19 Q    And are those paper and electronic files kept in the

20 ordinary course of L&I's business?

21 A    Yes.

22 Q    And is it the regular practice of L&I to maintain records

23 with respect to properties and enforcement actions?

24 A    Correct.

25 Q    And so you reviewed the entire enforcement file with

Rybakowski - Direct                           46

1  respect to this property when you took over the case in 2016?

2  A    Yes.

3           MS. THURMOND:  May I proceed, Your Honor?

4           MR. SCHOLL:  Well, she hasn't established he's the

5  custodian of records.  All she's established is that L&I had

6  records, not that he would have any particular custodial --

7           THE COURT:  Her last question was had he taken over

8  this case, I believe that establishes him as the custodian of

9  these records.

10          MR. SCHOLL:  I'm not -- I'm not sure it does, Your

11  Honor, he's not a custodian.

12          THE COURT:  Well, tell me why not.

13          MR. SCHOLL:  Just because he took over the case, that

14  doesn't say that he's the custodian of the records.

15          THE COURT:  How would you establish it, Mr. Scholl?

16          MR. SCHOLL:  I -- I'd get somebody in here who is a

17  records custodian, that's how I'd do it.

18          THE COURT:  Nobody has records custodians anymore,

19  Mr. Scholl.

20          MR. SCHOLL:  Oh, I think --

21          THE COURT:  Everyone simply is assigned to their --

22  to the work that they're doing.  This is his case, these are

23  his records.

24          MR. SCHOLL:  I don't think they're his records.

25          MS. THURMOND:  Does --

Rybakowski - Direct                                47

1           MR. SCHOLL:  Somebody's records.

2           MS. THURMOND:  Does Mr. Scholl want to stipulate to -

3  - I mean the -- the State Court complaints and the orders that

4  are issued?  Then we can move it along and I wouldn't haven't

5  to go through those with the --

6           THE COURT:  Mr. Scholl?

7           MR. SCHOLL:  Yeah, I probably would, yes.

8           THE COURT:  Well, will you or won't you?

9           MR. SCHOLL:  I will.

10          THE COURT:  All right.

11          MR. SCHOLL:  They're orders.

12          THE COURT:  Let's get on with it.

13          MS. THURMOND:  Okay.  So then I would just ask for

14  City Exhibit 6, which is the 2012 complaints;

15          City Exhibit 7, which is the court order -- praecipe

16  to enter judgment as of January 22nd, 2003 -- or 2013;

17          The City Exhibit 8, which is a November 2nd, 2012

18  order regarding the demolition of the rear L;

19          City Exhibit 9, which is the 2016 equity action by

20  the City;

21          City Exhibit 10, which is an order dated February

22  2nd, 2016.  I would note for the record, I think this is a

23  typo, and it actually meant February 2nd, 2017 because it

24  refers to dates in 2017, and I don't know how that would be

25  possible if it was '16.  I think it's a typo by the Court;

Rybakowski - Direct                                    48

1          City Exhibit 11, which is a November 13, 2017 order -

2   - April 13th, 2017 order, I'm not sure if I said that

3   correctly;

4          And City Exhibit 22, which is a November 1st, 2012

5   order.

6          With that, I'll move on to another topic.

7   BY MS. THURMOND:

8   Q    Did there come a time when the City had to take immediate

9   enforcement action with respect to a portion of the property?

10  A    Yes, in 2012, the rear section of the property was torn

11  down following a collapse of the side wall onto 16th Street.

12  Q    And who -- when you say it was torn down, who tore it

13  down?

14  A    The City's subcontractors appointed by L&I.

15  Q    So an agent on behalf of L&I tore it down.

16  A    Correct.

17  Q    Okay.  And why was it necessary for that to happen?

18  A    Because the property was --

19          MR. SCHOLL:  Well, again, Your Honor --

20  Q    -- deemed eminently (sic) dangerous.

21          MR. SCHOLL:  -- he's talking about -- now these are

22  not records.  He's just talking about their actions and, again,

23  it's well before he was even hired.

24          MS. THURMOND:  I can move on.

25          THE COURT:  Okay.

Rybakowski - Direct                                                49

1  BY MS. THURMOND:

2  Q    Mr. Baron -- or -- can you go back to Exhibit City 2 for

3  me?

4            MR. SCHOLL:  What was that?

5            MS. THURMOND:  Exhibit City 2.

6            MR. SCHOLL:  2, okay.

7  Q    These were the photographs that you said you took on April

8  26th, 2018?

9  A    Yes.

10 Q    Was that the last time you visited the property?

11 A    That's the last time I was at the property.

12 Q    Was this the first time you were at the property?

13 A    No.

14 Q    How many times have you visited the property?

15 A    Actually walking the property, this was the last time

16 walking the property.  Actually seeing the property, I see it

17 almost on a -- if not daily, every other day because we drive

18 by it all the time on 16th Street.

19 Q    So in the course of your going out per your duties for L&I

20 for other properties, you drive by.

21 A    Correct.

22 Q    What is the current classification of this property by

23 L&I?

24 A    The current designation of the property is unsafe.

25 Q    Why has this property been designated unsafe by L&I?

1  A    The property's been designated unsafe for the front and

2  side wall, the deterioration of the bricks.

3  Q    Okay.  Since none of us are L&I experts except for you,

4  can you explain to the Court what you mean by deterioration of

5  bricks?

6  A    The deterioration of the bricks are that the -- it could

7  also be classified as de-lamination.  What happens is the

8  bricks -- the glazing on the front of the bricks actually

9  deteriorates off of the -- off of the bricks themselves.  What

10 happens is over time, as water penetrates into the property,

11 and it isn't maintained, the mortar will actually start to pull

12 away, water comes in behind the mortar, and penetrates through

13 the brick.  Over time, it freezes or it expands, and it will

14 actually break off portions of these bricks.  And over time, if

15 they're not maintained, de-lamination happens where the bricks

16 actually break off and allow more water to penetrate into the

17 structure.

18 Q    And why is water penetrating into the structure a problem?

19 A    Water's penetrating into the property because of lack of

20 maintenance of the property.

21 Q    I know, but why is the presence of water penetrating the -

22 - into the bricks a problem?

23 A    Because any time water penetrates into a structure, it

24 causes rot, deterioration, it causes a location to deteriorate

25 over time.

Rybakowski - Direct                                51

1  Q    All right.  Can you turn to the second page of the photos?

2  And correct my wrong (sic), but what we're looking at is like a

3  snapshot or close up of a place of the bricks between two

4  windows, is that correct?

5  A    Yes.

6  Q    And can you explain what's going on in this section of the

7  brick?

8  A    It's a classic illustration of what de-lamination is.

9  It's where the mortar is actually pulled away from the

10 structure, allowing water to penetrate in between these bricks,

11 and causing the scaling or the glazing of the bricks to

12 actually break off.

13 Q    And also if you go to the third page of the photos, is

14 this also -- and we are seeing a portion that's on the side of

15 the two windows, is this also an area where there potentially

16 can be de-lamination?

17 A    Yes, it is another sign of de-lamination.  It is the top

18 portion of the property between the second and third floor on

19 the left-hand side of the location.

20 Q    And then if you could turn -- one, two, three, four, five,

21 six, seven, eight, -- nine pages in, which is a view of the

22 side of the building towards North 16th Street, and it has a

23 picture of the utility pole.

24                         (Pause)

25 Q    Let me know when you're there.

Rybakowski - Direct                              52

1  A     Yes.

2  Q     Okay.  Is -- are  the windows missing from this side of

3  the property?

4  A     Yes, the second story rectangular, and then up at the roof

5  line, the arch window is missing, as well.

6  Q     Okay.  And then if you can go to the next page, it shows

7  the back -- the rear part of the building.

8  A     Yes.

9  Q     What's going on at the -- on the rear of the building?

10 A     The rear of the property, it shows -- or this picture

11 shows that the -- there was a temporary wall that was

12 constructed.  When the known L was removed or demolished off

13 the property, a temporary wall was installed.  This wall -- it

14 shows that an installation of Tyvek, which is a weatherproof

15 membrane was adhered to the wall.

16 Q     All right.  So who did that installation?

17 A     The City did.

18 Q     And then if you go one, two, three, four -- five pages in,

19 are these, this page and the following pages, pictures of the

20 interior of the building?

21        MR. SCHOLL:  What picture is that?  I can't follow

22 this.

23        MS. THURMOND:  Mr. Scholl, maybe I can help you get

24 on the right page.

25        MR. SCHOLL:  Sure.

Rybakowski - Direct                                    53

1                              (Pause)

2   BY MS. THURMOND:

3   Q    Are these pictures of the interior of the building?

4   A    Yes, it's -- where it starts with the picture of the

5   spotlight or the floodlight?

6   Q    Yes.

7   A    Yes.   Then it's the interior -- specifically the basement.

8   Q    Okay.   And why was it important to L&I to inspect the

9   basement of the property?

10  A    Well, we gained access to the property, I gained and made

11  my way through the basement and first floor, and up through the

12  -- an extension ladder to the second floor, only could get to

13  the second floor floor joist systems, after that, I didn't feel

14  safe enough to go any further into the property.

15  Q    So is there no stairwell that goes from the first floor to

16  the second floor?

17  A    There's no staircase, no.

18  Q    Are you aware the petition to -- actually it's two

19  petitions to appoint a conservator with respect to this

20  property?

21  A    Yes.

22  Q    And you're aware generally of the conservatorship action?

23  A    Yes.

24  Q    What is L&I's position as to the appointment of the

25  conservator with respect to the property?

Rybakowski - Direct                                    54

1  A     Whether an appointed conservator, or the owner, L&I's

2  position is we would just want to see the property repaired and

3  brought back to a safe condition.

4  Q     Do you know what is needed to be done at this point to

5  bring the property from an unsafe condition to safe condition?

6  A     At this point, we would ask for a design professional or

7  an engineer to describe how the front and side walls would need

8  to be constructed or repaired due to the amount of de-

9  lamination that's occurred at the location.

10              MS. THURMOND:   I have no further questions at this

11 time.

12              THE COURT:   Ms. Bloom?

13              MS. BLOOM:   May I?

14              THE COURT:   Um-hum.

15                        CROSS-EXAMINATION

16 BY MS. BLOOM:

17 Q     Good afternoon, Mr. Rybakowski, I only have a few

18 questions for you.   My first question is when looking through

19 and reviewing the records from the various cases that L&I has

20 in its position -- or, excuse me, in its possession, are you

21 aware of the total fines, judgments, and other charges that the

22 City of Philadelphia currently has that are attached to or

23 otherwise relate to the property?

24 A     Yes.

25 Q     And what is that total?

Rybakowski - Cross/Bloom/Scholl                    55

1  A    It's approximate -- it's a little over $300,000.

2  Q    Thank you.  And my other question is in your opinion, also

3  having reviewed the file that L&I has in its possession, does

4  L&I have an opinion or, I suppose do you have an opinion, of

5  whether the current owner or a third party, such as a

6  conservator, would be in a better position to abate the unsafe

7  conditions of the property?

8         MR. SCHOLL:  Objection; I don't see how he could

9  answer that.

10        MS. BLOOM:  Your Honor, this goes to his

11 understanding as a representative of L&I.

12        THE COURT:  He's hardly an expert on what an

13 unappointed conservator can do versus what these people can do.

14 It's just a nonsensical question, Ms. Bloom.

15        You can -- I'll let you ask it, but I ain't gonna pay

16 any attention to the answer.

17        MS. BLOOM:  All right; I withdrawal the question.

18        THE COURT:  Cool.

19        MS. BLOOM:  Thank you.

20        THE COURT:  Thank you.  Cross?

21                    CROSS-EXAMINATION

22 BY MR. SCHOLL:

23 Q    Sir, are you -- you're aware that at -- when the walls --

24 some of the walls were torn down, that the owner wanted to have

25 all of the walls torn down?  You're -- are you aware of that?

Rybakowski - Cross/Scholl                                56

1  A    I know of a demolition permit that was applied for to the

2  Department of License & Inspections.

3  Q    All right.  But isn't it true -- maybe you don't know --

4  that the owners of the building wanted to have all the walls

5  torn down, the entire building torn down?  Are you aware of

6  that?  I mean if you're not, then okay.

7  A    What time frame are we talking about, sir?

8  Q    When that was done in 2012, when you took down the part of

9  -- not you, but some City contractors took down part of the

10 walls --

11         MS. THURMOND:  Can we just ask that Mr. Santiago keep

12 his comments to himself --

13         MR. SANTIAGO:  Sorry.

14         MS. THURMOND:  -- because it is distracting.

15         THE COURT:  You really have to stop talking, both of

16 you, okay?  If you need to talk to Mr. Scholl, we'll take a

17 break and let you do that, that's fine.

18         MR. SANTIAGO:  Okay.

19         THE COURT:  But I need you not to be speaking out in

20 court, okay?

21         MS. THURMOND:  And may I ask that -- I believe that

22 this is Mr. Santiago, the son, and is not the property owner

23 for this -- not the other -- the husband.

24         MR. SANTIAGO:  But I have the power of attorney.

25         MR. SCHOLL:  Right.  Whether you have the power of

Rybakowski - Cross/Scholl                              57

 1  attorney or not, doesn't matter.

 2          THE COURT:  Sir, I'll put you out if you don't stop

 3  talking.

 4          MR. SANTIAGO:  Okay, all right.  I just wanted to

 5  clarify what was --

 6          MR. SCHOLL:  He is --

 7          THE COURT:  You're still talking.

 8          MR. SCHOLL:  He is Miguel Santiago, Junior.

 9          THE COURT:  And that's all fine, but he needs to stop

10  talking, Mr. Scholl, okay?

11          MR. SCHOLL:  The talking is not the appropriate way,

12  no matter who he is.

13          But just to explain who he is, because I think she

14  was really trying to find out.  He is the only son of the

15  Santiago, and he really is the one who has been doing all of

16  the prepare and planning for the building for some time.

17          MS. THURMOND:  I mean my point is just that I want

18  the talking to stop so I can hear what's going on, that's my

19  only point.

20          MR. SCHOLL:  Good point.  Good point.

21          THE COURT:  It's also disturbing me.

22          MR. SANTIAGO:  Okay.

23          THE COURT:  And you don't want me disturbed.  You

24  want me listening.

25          MR. SANTIAGO:  I got it.

Rybakowski - Cross/Scholl                                   58

1              THE COURT:  Very good.

2  BY MR. SCHOLL:

3  Q    I had asked you something about not -- knocking all the

4  walls down, do you know anything about whether --

5  A    I do know that there was a court case that was done in

6  2012 where a court order was issued for the City to go ahead

7  and, with the assistance of their subcontractors, to demolish

8  the rear portion of the property.

9  Q    All right.  You don't know whether there was any

10 discussion about knocking down any of the other walls.

11 A    Whether that was part of the court case or not, I can't

12 say whether --

13 Q    All right, okay.  Fair enough.  Do you -- do you -- also,

14 do you know whether the City took any action against the

15 Santiagos in Bankruptcy Court in 2000 -- from any time from

16 2014 to 2016?

17             THE COURT:  Mr. Scholl, you're the one who's already

18 objected to his testifying to anything before he was employed

19 in 2016.

20             MR. SCHOLL:  All right.  I mentioned 2014 --

21             THE COURT:  So you can ask him about 2016 up.

22 Q    Well, from -- they didn't file the bankruptcy until 2014.

23 When is it that you began working for L&I?

24 A    2014.

25 Q    Do you know the exact time in 2014?

Rybakowski - Cross/Scholl                                    59

1  A    I was in -- I started my employment with L&I in October of

2  2014.

3  Q    Okay.  Was there any action taken by L&I in the Bankruptcy

4  Court after October, 2014 --

5          MS. THURMOND:  Objection, Your Honor.

6  Q    -- until the case was dismissed in 2016 --

7          THE COURT:  Wait.

8  Q    -- actually dismissed in 2017?

9          THE COURT:  Your objection, Ms. Thurmond?  You don't

10 answer until I hear from Ms. Thurmond.

11         MS. THURMOND:  My objection is -- I mean he's an L&I

12 witness, he's not an expert in the bankruptcy case and what

13 happened, he was not employed by the City to review the

14 bankruptcy case or to have a role in the bankruptcy.

15         THE COURT:  It's still just a question of -- you can

16 certainly make the point on your cross-examination that that's

17 not his area of expertise, nor would he be likely to know

18 anything about it.  But there's nothing wrong with the

19 question, Ms. Thurmond.

20         MS. THURMOND:  Very good, Your Honor.

21         THE WITNESS:  Sorry; repeat --

22 Q    Can you answer?

23 A    I'm sorry; repeat your answer.

24 Q    Was there any action taken by the City in the Bankruptcy

25 Court regarding this property from October of 2014 when you

Rybakowski - Cross/Redirect                    60

1  started, until 2017 when the case was dismissed?

2  A    I do know that there was a bankruptcy filing, but I don't

3  know the terms.

4  Q    Okay, all right, thank you.

5         MR. SCHOLL:  I don't have any other questions, Your

6  Honor, thank you.

7         THE COURT:  Redirect?

8         MS. THURMOND:  Yes, Your Honor, briefly.

9                    REDIRECT EXAMINATION

10 BY MS. THURMOND:

11 Q    Were you involved -- do you handle bankruptcy matters for

12 the City of Philadelphia?

13 A    No.

14 Q    Do you represent L&I with --

15        MS. THURMOND:  Strike that.

16 Q    In 2015, were there violations that L&I issued with

17 respect to the property?

18 A    Yes.

19 Q    And that would have been between 2014 and 2017 when the

20 bankruptcy was taking place?

21 A    Yes.

22 Q    And in 2016, was there equity action commenced against the

23 Santiagos in State Court?

24 A    Yes.

25        MS. THURMOND:  No further questions.

61

1           MS. BLOOM:  No questions, Your Honor.

2           THE COURT:  Anything else?

3           MR. SCHOLL:  I don't have anything further.

4           THE COURT:  You may step down.

5           MR. RYBAKOWSKI:  Thank you.

6           THE COURT:  Thank you.

7                         (Pause)

8           THE COURT:  Okay.

9           MS. THURMOND:  My last witness, Matthew Burton

10  (phonetic), who is a tax analyst with the Department of

11  Revenue.  My only purpose for calling him, Your Honor, is to

12  essentially read in the numbers from the City's proof of claim,

13  but perhaps Mr. Scholl wants to either stipulate not to -- he -

14  - I mean obviously they can dispute the City's proof of claim

15  at some point down the road, but just that they are filed of

16  record with the numbers that they are.

17          MR. SCHOLL:  There's a claim filed of record, and I

18  think we can take notice of what it says.

19          MS. THURMOND:  Okay; very good.  So --

20          THE COURT:  You can sit down.

21          MS. THURMOND:  I think -- I took away your moment in

22  the spotlight.

23                         (Laughter)

24          MS. THURMOND:  Just for the record, this is

25  Exhibit City 23, which is a claim filed by the Water Revenue

62

1   Bureau;

2           City 24, which is a claim filed by the Water Revenue

3   Bureau;

4           And City 25, which is a claim filed by the City of

5   Philadelphia for taxes and other debt, including L&I debt, and

6   judgments.

7           MR. SCHOLL:  They've all been filed, Your Honor, I've

8   seen them.

9           THE COURT:  Okay; all right.

10          MS. THURMOND:  At this point, the City would like to

11  call Mrs. Santiago as on cross.

12          THE COURT:  All right.  Mr. Santiago --

13          MR. SANTIAGO:  Me?

14          MS. THURMOND:  No, Mrs. Santiago.

15          THE COURT:  Oh, Mrs. Santiago.  Mrs. Santiago, will

16  you come up here and be sworn, please.

17          MS. THURMOND:  Mrs. Santiago, will you take the

18  witness stand?

19          MR. SCHOLL:  She's called you, Mrs. Santiago.

20          MS. THURMOND:  May I ask that Mr. Santiago please

21  stop talking?

22          MR. SANTIAGO:  I was just helping my mother where to

23  go.

24          THE COURT:  I --

25          MR. SCHOLL:  Okay, she found it.

63

1                    THE COURT:  Okay.  It's all right.

2                    MR. SCHOLL:  Thank you.

3                    THE COURT:  There are other people who can do that

4    for her, you just need to sit back.

5                    MR. SANTIAGO:  I'm sitting.

6                          (Pause)

7                    MRS. SANTIAGO:  I need somebody -- I need somebody

8    speaks Spanish, you, okay, my son.  I need my on to be here.

9                    MS. THURMOND:  No, Your --

10                   THE COURT:  You can't have him here.

11                   MS. THURMOND:  Mrs. Santiago, you need to listen to

12   my questions.

13                   MR. SANTIAGO:  She needs an interpreter.  Is that

14   what you need?

15                   MRS. SANTIAGO:  Yeah, can you talk?  Can you be

16   interpreter in Spanish?

17                   MR. SCHOLL:  Well, if they'll stipulate to it, I -- I

18   wouldn't mind --

19                   MS. THURMOND:  No, Your --

20                   THE COURT:  If they'll stipulate to what, Mr. Scholl?

21                   MR. SCHOLL:  Uh --

22                   THE COURT:  I don't have an authorized --

23                   MR. SCHOLL:  Well, it's a question -- I don't know

24   who she's asking the question to.

25                   THE COURT:  I can't have any unauthorized

64

1    interpreters.  If there's an interpreter, it has to be an

2    authorized interpreter.  If she needs an interpreter, you

3    should have brought one.

4              MS. THURMOND:  I have --

5              MR. SCHOLL:  I didn't plan to call her as a witness,

6    Your Honor.

7              THE COURT:  It doesn't --

8              MS. THURMOND:  I --

9              THE COURT:  Mr. Scholl, what did you expect was going

10   to happen today?

11             MR. SCHOLL:  I did not expect that they would call

12   Mrs. Santiago.

13             THE COURT:  Why would you not expect that since she's

14   the property owner?

15             MR. SCHOLL:  Because I don't think --

16             THE COURT:  I was expecting to hear from her.

17             MR. SCHOLL:  -- there's any evidence that they're

18   going to be able to adduce from her, but that's their case.  I

19   mean I'm not their lawyer.

20             MS. THURMOND:  Your Honor --

21             MR. SCHOLL:  I don't know why they'd call her.

22             MS. THURMOND:  I don't want to speak --

23             THE COURT:  All right.

24             MRS. SANTIAGO:  My problem is --

25             THE COURT:  Let me be very --

 1                MRS. SANTIAGO:  My problem is that I'm --

 2                THE COURT:  -- clear --

 3                MRS. SANTIAGO:  My problem is that I don't understand

 4   what she gonna say, what she gonna say to me.  My son, he can

 5   say what she said to me in Spanish.

 6                THE COURT:  He can't do that, ma'am.

 7                MS. SANTIAGO:  Oh.

 8                THE COURT:  It's not legal.

 9                MS. SANTIAGO:  Oh.

10                THE COURT:  We have to have an official interpreter

11   if you want an interpreter.

12                MS. SANTIAGO:  Okay.

13                MS. THURMOND:  Your Honor, I may -- I just want to

14   state for the record that I did --

15                MS. SANTIAGO:  Can I say what is -- what I can do?

16                THE COURT:  Mrs. Santiago, you need to stop talking,

17   wait for a moment, let us all figure this out, okay?  Then

18   we'll --

19                MS. THURMOND:  Um --

20                THE COURT:  Then we'll talk to you.

21                MS. THURMOND:  I'm sorry, Your Honor.  I did call Mr.

22   Scholl last week because I did hear that Mrs. Santiago would

23   need a Spanish speaker, and I was concerned about that

24   interpreter issue.   I did actually even have a conversation

25   Ms. Ranieri, and she provided me with a list of the -- actually

1 Linda from Judge Coleman's office provided me with a list of

2 people, and then I called Mr. Scholl and I said does your

3 client need an interpreter?  And he said, no.  So I did not go

4 forward with making arrangements for an interpreter because I

5 didn't want to make arrangements if it was not necessary.

6        So I will come to the microphone so Mrs. Santiago can

7 hear me more clearly, and we'll do the best we can.

8        THE COURT:  Okay.

9         NORIS SANTIAGO, MOVANT'S WITNESS, SWORN

10        ELECTRONIC COURT RECORDER:  State your name, spell

11 your last name, and give your address.

12        THE WITNESS:  My name is Noris Santiago, it's N O R I

13 S  S A N T I A G O.

14        THE COURT:  And your address, Mrs. Santiago.

15        THE WITNESS:  7719 Fairfield, Philadelphia,

16 Pennsylvania 19152.

17        THE COURT:  Your witness, Ms. Thurmond.

18        MS. THURMOND:  Thank you, Your Honor.

19                    DIRECT EXAMINATION

20 BY MS. THURMOND:

21 Q   Mrs. Santiago, my name is Pamela Thurmond, I'm a lawyer

22 for the City of Philadelphia in this bankruptcy proceeding.  If

23 you can't hear me at any time during my questioning, will you

24 just let me know?

25 A   Okay.  I can hear you, but sometime I can't understand

N. Santiago - Direct                          67

1 what you want to -- what do you say to me.

2 Q    Okay, that's fair.  So I would just ask if you could hear

3 my question, but if you need clarification or perhaps you need

4 me to reword it another way, can you just let me know, and I'd

5 be happy to clarify my question and reword it.

6 A    (No verbal response).

7 Q    Can we agree on that, ma'am?

8 A    Say it again?

9 Q    Can we agree that if you need clarification of my

10 question, or you need me to ask the question again, you'll let

11 me know?

12 A    Okay.

13 Q    Okay.  Mrs. Santiago, are you aware there was a

14 conservatorship petition filed with respect to your property at

15 1601 Mount Vernon Street?

16 A    Say it again.

17 Q    Are you aware there was a conservatorship petition -- let

18 me back up.  Do you own the property at 1601 Mount Vernon

19 Street?

20 A    Yes.

21 Q    You do own the property?

22 A    Um-hum.

23 Q    Do you own the property with anyone else?

24 A    My husband.

25 Q    Okay.  And your husband, is he still alive?

N. Santiago - Direct                         68

1  A    He is still alive, but he's very sick.

2  Q    Okay.  I'm going to refer to 1601 Mount Vernon as the

3  property, is that okay with you?

4  A    Say it again.

5  Q    When -- I'm going to refer to 1601 Mount Vernon Street as

6  just the property, is that okay with you?

7  A    No, the property, I don't know what that word means.

8  Q    The property.  I'm going to call 1601 Mount Vernon Street

9  the property, is that okay with you?

10 A    I don't know --

11 Q    It's kind of like a shorthand --

12 A    I can't understand what you're saying.

13 Q    Okay.  Do you know if anyone ever asked to be appointed as

14 conservator of 1601 Mount Vernon Street?

15 A    No.

16 Q    You're not aware?

17 A    No.

18 Q    Okay.  Did you know if there was a State Court hearing on

19 April 18th?

20 A    No.

21 Q    No, you weren't aware?

22 A    No.

23 Q    Did you go to a hearing at Philadelphia City Hall on April

24 18th?

25 A    Um, I went to (indiscernible - reverberation) remember

N. Santiago - Direct                                    69

 1  what's that (indiscernible - reverberation) the date.

 2  Q    Okay.  Was -- when you went, did you go recently?

 3  A    No, they didn't let me say nothing.  I didn't talk that

 4  time.

 5  Q    When you say they don't let you say --

 6  A    When they ask me for nothing.

 7  Q    Okay.  And so who's the they in that sentence?  Do you

 8  mean the other lawyers or the court?

 9  A    It was the court.

10  Q    Okay.  So the court didn't ask you to speak at that time?

11  A    No.

12  Q    Do you know if --

13  A    (Indiscernible - reverberation) speak nothing.

14  Q    Do you know if that was --

15  A    Every time I come (indiscernible - reverberation) me talk.

16  Q    Okay.  Do you know if that hearing where you were present,

17  was that on April 18th, or was that a different day?

18          MR. SCHOLL:  Better give her the year, she might --

19          MS. THURMOND:  Oh, I'm sorry; that's fair.

20  Q    Do you know if that was on April 18th of 2018?  So this

21  just last month?  Or was that on a different day?

22  A    It was different day.

23  Q    Okay, it was a different day.  So did you go to

24  Philadelphia City Hall for court last month, in April of 2018?

25  A    Oh, April the -- this year?

                          N. Santiago - Direct                    70

1   Q    This year, yes.

2   A    No.

3   Q    Okay.  Why did you file this bankruptcy case?

4   A    Because I want to save my property.  I want to save my

5   property (indiscernible - reverberation) I don't

6   (indiscernible - reverberation) my property.

7   Q    Okay.  So when you say --

8   A    Everything -- everything they say here is the lies.  Lies.

9   Q    Okay, ma'am --

10          THE COURT:  I'm going to ask you to leave.  You don't

11  sit there and shake your head.  You're going to leave the room

12  now.  Now.

13          MR. SANTIAGO:  Okay.

14          THE COURT:  We'll have you back in here when your

15  mother's finished.

16                        (Pause)

17          THE WITNESS:  I bring him because he is -- he --

18          MS. THURMOND:  Ma'am, there's no pending question.

19  Please wait for my next question.  Thank you.

20          THE COURT:  Mr. Scholl, if you can't control --

21          MR. SCHOLL:  He's going to leave, I think.

22          THE COURT:  If you can't control your witnesses, we

23  have a serious issue.

24          MR. SCHOLL:  Well, you asked him to leave.  I think

25  he's going to leave.

N. Santiago - Direct                                    71

1          THE WITNESS:  But I think he's talking --

2          MS. THURMOND:  Ma'am --

3          THE WITNESS:  -- but I don't know (indiscernible -

4  reverberation) --

5          MS. THURMOND:  Ma'am, please wait for my question.

6          THE WITNESS:  Okay.

7  BY MS. THURMOND:

8  Q    I -- when I'm ready -- I was waiting for the -- for

9  everyone to be situated again.  When you were just speaking

10 with me again, you said you filed bankruptcy to save my

11 property.  What property are you speaking of?  What's the

12 address?

13 A    Seven -- 1601 Mount Vernon.

14 Q    1601 Mount Vernon.  Did you file bankruptcy to prevent the

15 appointment of a conservator with respect to 1601 Mount Vernon?

16 A    Yes, because they want to take my property away from me.

17 Q    Okay, thank you, ma'am.  Did you file schedules in this

18 bankruptcy case?

19 A    Say it again.

20 Q    Did you file what's called schedules in this bankruptcy

21 case?

22 A    (No verbal response).

23 Q    Let me -- let me show you something, ma'am.  In the binder

24 that's in front of you, the black and white binder, there are

25 documents and they have exhibit tabs on the side.  Can you turn

N. Santiago - Direct                                    72

1  to Number 17?   And if you need help, and you want me to show

2  it to you, or for Mr. Scholl to show which one it is, I'm happy

3  to help you, okay?

4  A    17?

5  Q    Yes, ma'am.

6  A    Why would -- I don't intend nothing --

7  Q    Ma'am, please --

8  A    You have to (indiscernible - reverberation).

9  Q    Please wait for my question.  Do you need help finding

10 Number 17?

11 A    (No verbal response).

12 Q    Do you want met to come help you find Number 17, ma'am?

13 A    I have 17.

14 Q    Okay.

15 A    It's nothing in 17.

16        MS. THURMOND:  May I approach, Your Honor.

17 A    It's blank.  It's a blank.

18                        (Pause)

19 Q    It's right here.

20 A    This is 18, not 17.

21 Q    Yeah, City 17, this is just a --

22 A    I thought you -- oh --

23 Q    Yeah, sorry.  It's a little bit hard (indiscernible - not

24 at microphone).  Okay.  Do you -- do you recognize this

25 document, Exhibit --

N. Santiago - Direct                                73

1  A    No.  No.

2  Q    If I tell you this is the Schedule A/B of property that

3  was filed in this current bankruptcy case --

4  A    I don't want to talk nothing.  I don't know what you're

5  saying.

6  Q    Okay.  Let me back up again.

7  A    I don't know.  I don't want to talk nothing.

8           THE COURT:  It's not an option, madam.

9           THE WITNESS:  Yeah, but --

10          THE COURT:  You will answer questions.  If you don't

11  know the answer, you can tell her you don't know the answer.

12          THE WITNESS:  Okay, Your Honor.

13          THE COURT:  But you will answer any question that is

14  put to you, do you understand?

15          THE WITNESS:  Yeah, I under --

16          THE COURT:  Unless Mr. Scholl objects.

17          THE WITNESS:  Yeah, but I don't know what she's

18  saying.

19          THE COURT:  She -- she will repeat it.  She'll change

20  the words, she'll do what it takes.

21          THE WITNESS:  Yeah, I don't know what she said to

22  know to speak to her back to saying.

23  Q    Okay.  Mrs. Santiago, perhaps I can ask another question,

24  and maybe I can clarify this for you.  Have you seen this

25  document before?  These pages that are part of City 17?

N. Santiago - Direct                          74

1    A     (No verbal response).

2    Q     Have you seen these pages before?

3    A     No.

4    Q     Did you provide information to Mr. Scholl about the

5    property you own as part of the bankruptcy case?

6    A     Say it again.

7    Q     Did you provide to Mr. Scholl or his office information

8    about the properties you own?

9    A     No.

10   Q     You never provided any information to Mr. Scholl about the

11   properties you own?

12   A     I don't know what you're saying.  I don't -- I don't want

13   -- I can't answer.  I don't know what you're saying.

14   Q     Okay.  So I guess your answer is you're having trouble

15   understanding my question.  Mr. Scholl is your attorney in this

16   bankruptcy case, is that correct?

17   A     Yes.

18   Q     In addition to -- do you -- in addition to 1601 Mount

19   Vernon, do you own any other property in the City of

20   Philadelphia?

21   A     Yes.

22   Q     Okay.

23   A     My house.

24   Q     Okay.  Can you tell me the addresses of those properties?

25   A     7719 Fairfield.

N. Santiago - Direct                          75

1 Q    It's 7719 Fairfield Street?

2 A    Fairfield.

3 Q    Fairfield Street, okay.  Anything else?

4 A    That's it.

5 Q    Okay.  And how do you own 7719 Fairfield Street?  Do you

6 own it by yourself, or do you own it with someone else?

7 A    My husband and I.

8 Q    Okay.  Your husband and I -- your husband and yourself own

9 it together.

10 A   Yes, he's sick.

11 Q   Okay.

12 A   Very sick in the house.

13 Q   Do you own a property at 3164 North 6th Street?

14 A   He does the cleaner where my son works.

15 Q   Okay.  So there's a dry cleaner at --

16 A   Yeah.  Yes.

17 Q   Do you own that property that the dry --

18 A   (Indiscernible - reverberation) not now, my son has it.

19 Q   Okay.  So you used to own it, but your son now owns it, is

20 that correct?

21 A   Yes.

22 Q   Okay.  Does he own the dry cleaner, as well, or just the

23 property?

24 A   The property.

25 Q   Okay.

N. Santiago - Direct                          76

1  A    And the cleaner.

2  Q    And the dry clear?  Okay.  What about -- do you own any

3  property at 3900 North 9th Street in Philadelphia?

4  A    Yes.

5  Q    Okay.  And what's at that location?

6  A    It's where like, you know, little clear that we call it

7  (indiscernible).

8  Q    I'm sorry, ma'am, can you repeat your question -- or your

9  answer, I'm sorry.

10 A    (Indiscernible - reverberation) you know, to -- very close

11 to the other cleaner.

12 Q    So I heard it's a little location.  Is there a building at

13 that location?

14 A    Yes, a -- a building, yeah.

15 Q    Okay.  Is it a house?

16 A    It's a house, yes.

17 Q    Okay.  Does someone live in the house?

18 A    Nobody live there.

19 Q    So it's vacant.

20 A    Yes, it's close.

21 Q    Okay.  Going back to the property at 7719 Fairfield

22 Street, which you said is your home.

23 A    Yes.

24 Q    Do you know what that property is worth?

25 A    No.

N. Santiago - Direct                              77

1  Q    Okay.  What about the property at 1601 Mount Vernon

2  Street?

3  A    Say it again.

4  Q    Sure.  The property at 1601 Mount Vernon Street, which is

5  the property that we're speaking of in this case, do you know

6  what that property is worth?

7  A    Oh, yeah, it cost a lot of money that is worth than my

8  house.

9  Q    Okay.  So I hear you saying it's worth more than your

10 house, but --

11 A    Correct.

12 Q    -- do you know what number that it's worth?

13 A    No, I can't say the number.

14 Q    Okay.  What about the property at 41 -- so you said the

15 property at 31 North 6th Street is owned by your son.  What

16 about the property at 3900 North 9th Street?

17 A    It's not worth nothing.  Peanuts.

18 Q    Okay.  So do you have any idea of a number?

19 A    No, 25,000.

20 Q    Okay.  Can you turn to Exhibit 18 in the book?  Do you

21 want me to come up and show you where it is?  Ma'am, would you

22 like me to come up and show you Exhibit 18?

23 A    What page?

24 Q    Here, I'll --

25         MS. THURMOND:  May I approach, Your Honor?

N. Santiago - Direct                          78

1          THE COURT:  You may.

2                      (Pause)

3   A    Yeah, they talking about my son and they look at them --

4   Q    Ma'am, I would just ask that until I have a question,

5   there's no need for you to speak.

6   A    When was (indiscernible).

7   Q    Ma'am, do -- you have Exhibit City 18 in front of you,

8   it's -- one, two, three -- four documents.  Four pages, are you

9   there?  You have the --

10  A    (No verbal response).

11  Q    Have you seen this document before?

12  A    No.

13  Q    As part of this bankruptcy case -- as part of the

14  bankruptcy case, did you provide information to Mr. Scholl

15  about your income?

16  A    No.

17  Q    Did you provide information to Mr. Scholl about your

18  expenses?

19  A    No.

20  Q    And you've never seen this document before?

21  A    No.

22  Q    What --

23  A    My son --

24  Q    What is your income?

25  A    My son know everything.

N. Santiago - Direct                              79

1  Q    Ma'am.

2  A    Yes?

3  Q    Are you employed?

4  A    No.

5  Q    Okay.  Do you have any source of income?

6  A    Yes.

7  Q    Okay.  What is your source of income?

8  A    Do I have to say this here?

9  Q    Yes, unless --

10 A    Why I have to say this here?

11        MS. THURMOND:  Your Honor, perhaps you --

12        THE COURT:  I -- I --

13        MS. THURMOND:  She's asking whether she has to state

14 -- answer my question.

15        THE COURT:  Yes, you have to answer the question.

16 A    Five ninety -- um, five ninety-six a month.

17 Q    I'm sorry.

18        THE COURT:  $596 per month?

19        THE WITNESS:  Yeah, five ninety-six.

20        THE COURT:  And that is income from?  I'm sorry, I'm

21 going to short circuit this because we got to get out of here

22 today.  Is that your Social Security?

23        THE WITNESS:  Um-hum.

24        THE COURT:  Do you have any other source of income

25 that you receive?

N. Santiago - Direct                          80

1           THE WITNESS:  No.

2           THE COURT:  Nothing from the dry cleaning business?

3           THE WITNESS:  No.

4           THE COURT:  No other sources.

5  BY MS. THURMOND:

6  Q    Did you get any -- okay.  Do you currently have insurance

7  for the properties?

8  A    Pardon me?

9  Q    Do you have insurance for the property at 1601 Mount

10 Vernon Street?

11 A    Yes.

12 Q    Do you have insurance for the other properties?

13 A    Yes.

14 Q    Can you turn to Exhibit City 19?

15          MS. THURMOND:  And I'll come -- if Your Honor will

16 allow, I'll come up and find the tab for her.

17          THE WITNESS:  I didn't expect this from you, it's not

18 (indiscernible - reverberation) somebody in Spanish, English.

19 Q    All right, Mrs. Santiago, have you ever seen this document

20 before?

21 A    No.

22 Q    Do you intend to make repair -- you can put the binder --

23 you can close the binder up and put it up so you don't have to

24 hold onto it, if that helps you.

25          THE COURT:  Thank you.

N. Santiago - Direct                                    81

1            THE CLERK:  (Indiscernible).

2            MS. THURMOND:  Not with this witness.

3   Q    Is your intention to make repairs to the property at 1601

4   Mount Vernon Street?

5   A    Yes, that's (indiscernible - reverberation).

6   Q    Okay.  And do you have money currently to --

7   A    (Indiscernible - reverberation) for this (indiscernible)

8   for this property.

9   Q    Okay.  Do you have an idea of how much it would cost to

10  make the repairs to the property?

11  A    No, I have -- I'm gonna find out.

12  Q    Okay.  Not yet, okay.  What are your sources for funding

13  repairs for the property?

14  A    They ask me to make the repair (indiscernible -

15  reverberation).

16  Q    Okay.  Can you repeat your answer for me, Your Honor --

17  ma'am.

18  A    My plan is to (indiscernible - reverberation).

19  Q    Okay.

20  A    And live there.

21  Q    Live at 1601 Mount Vernon?

22  A    Yes.

23  Q    Have you sought a loan from the bank or from a bank to

24  fund the repairs to the property at 1601 Mount Vernon?

25  A    Say it again?

N. Santiago - Direct                          82

1  Q    Have you ever sought a loan from a bank to make the
2  repairs?

3  A    No.

4  Q    You've never sought a loan from a bank?

5  A    No, (indiscernible - reverberation).  Every time I try to
6  (indiscernible - reverberation) they stop us.

7         MS. THURMOND:  All right.  I would ask to strike the
8  answer as being non-responsive.

9         THE COURT:  Well, we don't strike things anymore.

10        MS. THURMOND:  Okay.  All right; very good.

11        THE COURT:  You objection is noted.

12 Q    Do you know if your husband has sought a loan from the
13 bank to fix the property?

14 A    Say it again?

15 Q    Your husband, Mr. Santiago, do you know if he has sought a
16 loan to fix the property?

17 A    No.

18 Q    No, you don't know, or no, he hasn't sought a loan?

19 A    No, we don't -- he don't -- he is sick, he can't
20 (indiscernible - reverberation) sick.

21        MS. THURMOND:  All right.  Thank you very much, Mrs.
22 Santiago, for your patience.  This concludes my questions for
23 now.

24        THE COURT:  Ms. Bloom, any questions?

25        MR. SCHOLL:  Yes.  Yes, I do, Your Honor.

N. Santiago - Direct                          83

1          THE COURT:  No, no, hang on.

2          MS. BLOOM:  Ms. Bloom.

3          THE COURT:  Ms. Bloom, let me get her taken care of

4  first.  Hurry up, Ms. Bloom, we haven't got all day.

5          MR. SCHOLL:  Oh, okay.

6                      (Pause)

7          MS. BLOOM:  Your Honor, I -- I -- I do not have -- I

8  -- I apologize, Your Honor.  I -- I may have questions, but I -

9  - if it is all the same to the Court, I would be comfortable

10 asking them in Spanish, and then -- but no?  All right.

11         THE COURT:  What do you people --

12         MS. BLOOM:  Well, I apologize, Your Honor.

13         THE COURT:  We have a machine.

14         MS. BLOOM:  Yes.

15         THE COURT:  Okay?  The reason that we allow

16 authorized interpreters is we count on them because they're

17 sworn and everything else, to ask the questions properly.

18         You're not an authorized interpreter, so no.

19         MS. BLOOM:  I am not.

20         THE COURT:  Mr. Scholl won't know what you're asking

21 her, that's not fair to him either.

22         MS. BLOOM:  Yes, Your Honor.  In that case, I have no

23 questions; thank you.

24         THE COURT:  All right.  There you go.  Your -- your

25 witness, Mr. Scholl.

N. Santiago - Cross                                    84

1                       CROSS-EXAMINATION

2    BY MR. SCHOLL:

3    Q    Mrs. Santiago, do you read English?

4    A    No.

5    Q    All right.  But you do understand some English, is that

6    right?  Because you're testifying today.

7    A    Some (indiscernible - reverberation) I can speak

8    (indiscernible - reverberation).

9    Q    All right.

10   A    I can speak better some words, some thing I can understand

11   what they say.

12   Q    All right.  You did file a bankruptcy, though, with me as

13   your attorney, is that right?

14   A    Yes.

15   Q    Did you come to my house to prepare the papers to file

16   your bankruptcy?

17   A    Yes.

18   Q    How many times did you come to my house?

19   A    Twice.

20   Q    Okay.  Did we go over the information on the papers with

21   you and your son?

22   A    Um-hum.

23   Q    And you were there, is that right?

24   A    Yes, I was.

25   Q    All right.  Everything that we talked about, you agreed

N. Santiago - Cross                     85

1  with, is that right?

2  A    Correct.

3  Q    All right.  Now with respect to the properties that you

4  own, do you own -- are you and your husband the title owners of

5  the properties on 6th Street and 9th Street?

6  A    Correct.

7  Q    Okay.  So both of them, is that right?  So when you said

8  you didn't own it, that wasn't correct, was it?

9  A    Yes, because I don't understand her.

10 Q    Okay.  Do you understand me, though, I guess, okay.

11        THE COURT:  I'm having a little trouble with that,

12 Mr. Scholl, because you used an expression like title owners

13 and --

14        MR. SCHOLL:  Well --

15        THE COURT:  How she suddenly understands that, and

16 she didn't understand seeking a bank loan is beyond me.  But go

17 ahead.

18 Q    Well, as far as -- on the subject of a bank loan, has your

19 son tried to get bank loans?

20 A    Say it again.

21 Q    Is your son --

22        MS. THURMOND:  Objection.

23 Q    -- trying to get a loan for Mount Vernon's --

24 A    Yes.

25 Q    All right.  And you let that in the -- the -- that your

N. Santiago - Cross                           86

1   son, you let your son do that for you?

2   A     Yes.

3   Q     All right.  You don't get involved in that, is that right?

4   A     No.

5   Q     All right.  And as far as your income, and your property

6   ownership, we went over all that verbally, did we not?

7   A     Yes.

8   Q     Okay.  And it was right the way I put it on the papers,

9   isn't that right?

10          MS. THURMOND:  Objection, Your Honor.

11   A     Correct.

12          THE COURT:  Wait a minute.

13          MR. SCHOLL:  As far as she knows.

14          THE COURT:  I've got an objection here.

15          MR. SCHOLL:  Okay.

16          MS. THURMOND:  I think --

17          THE COURT:  I've got an objection, too.

18          MS. THURMOND:  -- Mr. Scholl is asking leading

19   questions.  This is his witness.

20          MR. SCHOLL:  Not my witness.

21          MS. THURMOND:  I mean he -- this is the debtor, he

22   should be asking non-leading questions.

23          THE COURT:  You have to ask like on direct.  You

24   don't get to treat her like a hostile witness just because you

25   didn't call her, Mr. Scholl.

N. Santiago - Redirect                    87

1          MR. SCHOLL:  I think I can ask her leading questions,

2 frankly.

3          THE COURT:  No, you can't, Mr. Scholl.

4          MR. SCHOLL:  And -- that's your ruling, I'll abide by

5 it.

6          THE COURT:  That's my ruling.

7          MR. SCHOLL:  Okay, all right.

8          THE COURT:  I'm also a little disturbed at the fact

9 that every question she was asked over here, she had never seen

10 these papers before, and now she has all this recollection of

11 going over all this stuff with you.  I'm having a little

12 trouble.  I would like to see the signed copy of the petition,

13 Mr. Scholl.

14          MR. SCHOLL:  Okay.  We have a signed copy of the

15 petition.

16          THE COURT:  I'm going to want to see it.

17          MR. SCHOLL:  All right.  You could see it.

18          I don't have any further questions.

19                    REDIRECT EXAMINATION

20 BY MS. THURMOND:

21 Q    Mrs. Santiago, do you need me to come -- yeah, let me come

22 to the microphone.  No, no, you stay, I'll come.  So when I

23 asked you previously, you said your son owned the property at

24 3164 North 6th Street.

25 A    Yeah, because the -- he's the one who can understand

N. Santiago - Redirect                                88

1  better (indiscernible - reverberation).  He knows everything

2  about the City (indiscernible - reverberation) --

3  Q    Ma'am, do you own -- so now you're saying you do own the

4  property at 3164 North 6th Street.

5  A    We gonna (indiscernible - reverberation) to him, the

6  property to my son.

7  Q    But you haven't done that yet.

8  A    Not yet.  This month, yes.

9  Q    Oh, so you're going to do --

10  A    (Indiscernible - reverberation).

11  Q    -- do it this month.  You're going to transfer the

12  property to your son this month.

13  A    Correct.

14  Q    Which is May, 2018.

15  A    (Indiscernible).  Depend.  I don't know.

16  Q    Okay.

17        MS. THURMOND:  I have no further questions.

18        MR. SCHOLL:  I have no further questions, Your Honor.

19        THE COURT:  You may step down, Mrs. Santiago; thank

20  you.

21                    (Pause)

22        MS. THURMOND:  The City would just ask for -- to move

23  in its exhibits.  I can give Your Honor a list of the ones that

24  we used.

25        THE COURT:  Any objection on any of the exhibits, Mr.

89

1 Scholl?

2          MR. SCHOLL:  Well, none of the ones we discussed -- I

3 don't have any problem with them.  I don't know if she's

4 offering something else.

5          THE COURT:  I don't think she's planning on

6 introducing --

7          MS. THURMOND:  No.

8          THE COURT:  -- anything other than the ones that were

9 actually discussed.

10          MS. THURMOND:  Yes, I can through the list really

11 quickly, but I'm not intending to use the ones I did not use

12 with the witness, and I will remove them from the binders at

13 the conclusion.

14          So we have Exhibit City 28, which was the 2003

15 Historical Commission letter;

16          City 27, which was the application for building

17 permits;

18          City 8, which was the State Court order;

19          City's second -- City 2, which was the photos;

20          City 3, 4, 5 through 11, which were all State Court

21 orders;

22          City 22 --

23          THE COURT:  What is that noise?

24          MR. BIELLI:  I lost count.

25          MS. THURMOND:  I'm sorry.

1            MS. BLOOM:  5 through 11.

2            MS. THURMOND:  28, 27, 8, 2, 3, 4, 5 through 11, 22,

3    which is another State Court order;

4            23 through 25, which are the City's proofs of claim

5    in this current 2018 bankruptcy;

6            17 through 19, which 17 is the Schedule A/B; 18 is

7    the Schedule I/J; and 19 is the plan.

8            THE COURT:  No objection, Mr. Scholl?

9            MR. SCHOLL:  No objection.

10           THE COURT:  All right.  I think we need to bring Mr.

11   Santiago back in; thank you.

12           MS. THURMOND:  So with that, Your Honor, that would

13   conclude the City's case in chief.

14           MRS. SANTIAGO:  Your Honor, if my son can speak?

15           THE COURT:  He's coming in.

16           MR. SCHOLL:  He's coming in.

17           MRS. SANTIAGO:  Oh, okay.

18           MR. SCHOLL:  She asked to bring him back.

19           MRS. SANTIAGO:  I'm sorry.

20           THE COURT:  No, it's all right.  It's all right.

21                        (Pause)

22           MR. SCHOLL:  Did I understand that the City was

23   resting?

24                   (No audible response heard)

25           MR. SCHOLL:  Okay.  So that -- I don't think they

M. Santiago                            91

1  said that.

2          THE COURT:  I -- you've got to speak up, Mr. Scholl.

3          MR. SCHOLL:  Okay.  I don't think they said that they

4  were resting, but I guess --

5          THE COURT:  She did.

6          MR. SCHOLL:  Okay, all right.  All right.

7          THE COURT:  All right.  Mr. Scholl?

8          MR. SCHOLL:  Mr. Santiago, I'm glad you're back.

9          MR. SANTIAGO:  Yay.

10          MR. SCHOLL:  I would like to call you as a witness.

11          MR. SANTIAGO:  All right.

12          MS. THURMOND:  Your Honor, I would object to this

13  witness, he's not the titled owner of the property.

14          THE COURT:  I don't know what he's being called as a

15  witness for, Ms. Thurmond.  You can ask for a statement with

16  that regard once we get him on the stand and sworn, and we will

17  then address the issue.

18          MS. THURMOND:  Okay, very good, Your Honor.

19          THE COURT:  Okay?

20                  (Pause)

21          MIGUEL SANTIAGO, DEBTOR'S WITNESS, SWORN

22          MS. THURMOND:  I would ask for a statement with

23  regard to the purpose of Mr. Santiago's testimony.

24          THE COURT:  We will.  Let's get him sworn in and --

25          MS. THURMOND:  Okay.

1        THE COURT:  -- and we'll --

2        MS. THURMOND:  I'm sorry, Your Honor, I'm being --

3        THE COURT:  We're going to have a record.

4        MS. THURMOND:  -- overeager.

5        ELECTRONIC COURT RECORDER:  Give your name, spell

6   your last name, and give your address.

7        THE WITNESS:  Miguel Santiago, S A N T I A G O, 7719

8   Fairfield Street, Philly P A 19152.

9        ELECTRONIC COURT RECORDER:  Thank you.

10       THE WITNESS:  You're welcome.

11       THE COURT:  Mr. Scholl, Ms. Thurmond has asked for a

12  statement with regard to the purpose of this witness.

13       MR. SCHOLL:  This witness, as the son of the two

14  Santiago owners of the properties has really taken over

15  handling the business of those properties.  And the reason why

16  is because both of his parents are up in years, they're over 70

17  years old, and their English is not very good.  And Mr.

18  Santiago is quite capable of speaking and understanding

19  English.

20       His -- I have never met Mr. Santiago, Senior, I don't

21  know whether he is or not, but I know the mother is limited in

22  her English, and he has handled all of the affairs.

23       So I think that he's the only one who can really give

24  accurate testimony as to what the debtor has been doing with

25  respect to her property.

M. Santiago                                         93

1              THE COURT:  Well, but the debtor is this lady sitting

2   here.

3              MR. SCHOLL:  Right, we understand that.

4              THE COURT:  And you did not bring an interpreter so

5   that I could have the benefit of hearing from her, and this is

6   not her, so I don't know why I would listen to him.

7              MR. SCHOLL:  Well, because I think that when somebody

8   is not conversant in English, and they're up in years --

9              THE COURT:  Then you have an --

10             MR. SCHOLL:  -- it's quite natural that they would

11  have --

12             THE COURT:  You have an -- you have an interpreter

13  for that person.

14             MR. SCHOLL:  Well, you could, but I didn't anticipate

15  her being called; I didn't call her.  I had no intention of

16  calling her because, frankly I don't --

17             THE COURT:  Mr. Scholl, this man is remote from this

18  debtor.  He may be her son, but he is not this debtor.

19             She is required to be able to tell me about her case.

20  And you're not giving me that opportunity because I'm not being

21  able to hear her speak because her English isn't good enough,

22  and you didn't bring an interpreter.

23             I'm not going to listen to someone else tell me what

24  she's supposed to be telling me.

25             MR. SCHOLL:  Well, she -- he's not going to talk

M. Santiago                                    94

1  about the contents of the petition, or any of that.  He's going

2  to talk about the property and the rehabilitation of the

3  property.

4            THE COURT:  He doesn't own the property.

5            MR. SCHOLL:  That doesn't mean that he couldn't be

6  doing it on his -- behalf of his mother.

7            THE COURT:  He -- and she can hire whomever she

8  wants, but she's the person who's got to tell me about it.

9            MR. SCHOLL:  Oh, Your Honor, I don't think that's

10 true, Your Honor.  I don't think a debtor has to be able to

11 express the -- not if they're not the one doing it.  If

12 somebody else is doing it on their behalf, and their authority,

13 I think that's perfectly --

14           THE COURT:  If she's incompetent then she --

15           MR. SCHOLL:  She's not incompetent.

16           THE COURT:  Well, if she's not incompetent, then

17 she's the one that has to speak, Mr. Scholl.  You're well aware

18 of the case law on this.  She is the one who has to speak.

19 He's not her next friend, he's not her custodian, he's not her

20 guardian, he's not her conservator.  If he were any of those

21 things, then it would be fine.  But he's not.

22           I have to hear from this lady and/or her husband

23 in --

24           MR. SCHOLL:  Well --

25           THE COURT:  -- order for me to be able to make a

M. Santiago                                    95

 1 determination with regard to credibility, etc.  I cannot listen

 2 to a third party.  I don't care how close he is to him.

 3        MR. SCHOLL:  Your Honor, with all due respect, Your

 4 Honor, I don't think you have to be incompetent to have

 5 somebody else act on your behalf.

 6        THE COURT:  Sir --

 7        MR. SCHOLL:  I think this happens all the time.

 8        THE COURT:  Sir -- sir, you're -- you're on the

 9 witness stand.

10        MR. SCHOLL:  You weren't told --

11        THE WITNESS:  You already told us you didn't want to

12 hear it, so --

13        MR. SCHOLL:  You weren't told to leave the witness

14 stand, Mr. Santiago.  Will you please go back?

15        I don't anything improper about their son being the

16 one who handled most of their business.

17        THE COURT:  I -- and that's just fine.  And if he

18 were an accountant, or something else, I might listen to him as

19 an expert of some sort.

20        Now you are asking me to listen to him instead of the

21 debtor.  And I'm only going to do that if, in fact, he's

22 appointed to be the debtor through some legal means.  Absent

23 that, you'd better get yourself an interpreter, and have this

24 lady tell us what she needs to tell us about her property.

25 That's why I wasn't very happy when she said she had never seen

M. Santiago                                    96

1  this petition before.

2        MR. SCHOLL:  Well, that's because --

3        THE COURT:  She allegedly signed --

4        MR. SCHOLL:  -- she doesn't read English, Your Honor.

5  I thought we brought that up.

6        THE COURT:  She allegedly signed it.

7        MR. SCHOLL:  She doesn't read English.  We had an

8  oral discussion.  She was sitting right there.

9        THE COURT:  She signed the document.  You told me she

10 signed the document.  She told me she signed the document, and

11 yet --

12        MR. SCHOLL:  She did.

13        THE COURT:  -- she's never seen it before.

14        MR. SCHOLL:  Well, it was all discussed right in

15 front of her.

16        THE COURT:  Well, Mr. Scholl, I don't see any reason

17 why this lady cannot provide the information that is needed for

18 me to be able to make a determination with regard to this case.

19        MR. SCHOLL:  Well, she can, but I don't think that

20 the fact that she personally cannot answer certain questions

21 disqualifies her from being a debtor, or anything like that.

22        THE COURT:  We're talking about pretty basic

23 questions, Mr. Scholl.  She didn't -- she didn't recognize her

24 plan.

25        MR. SCHOLL:  That's surprising, Your Honor.

M. Santiago                          97

1            THE COURT:  It's a plan.

2            MR. SCHOLL:  The --

3            THE COURT:  That's the whole -- the whole enchilada.

4   She's got to be able to understand her plan, right?

5            MR. SCHOLL:  Well, she certainly has to know how much

6   she has to pay.

7            THE COURT:  No, she has to understand the plan.

8            MR. SCHOLL:  I --

9            THE COURT:  You don't get to just --

10           MR. SCHOLL:  I think almost no debtors understand the

11  plans particularly since the new form is being used.  So I -- I

12  don't think it's a requirement that somebody has to understand

13  everything in a document.  They have to know the things that

14  are important.  They have to know how much they have to pay.

15  They have to know where to pay.  But I don't think there's any

16  law --

17           THE COURT:  If there's --

18           MR. SCHOLL:  -- or rule or --

19           THE COURT:  If anyone is going to explain to me about

20  how this debtor is going to, in fact, rehabilitate this

21  property, it's going to be Mrs. Santiago.

22           MR. SCHOLL:  Even if she can't, because she delegated

23  it to her son?

24           THE COURT:  She could do it if she had an

25  interpreter, I presume.

M. Santiago                                                    98

 1              MR. SCHOLL:  I don't think she could.

 2              THE COURT:  Because if she can't do it --

 3              MR. SCHOLL:  Not with an interpreter -- because she

 4    isn't doing it, he's doing it.  And there's nothing wrong with

 5    having him do it.

 6              THE COURT:  He's not a contractor.  He's not an

 7    accountant.  He's not -- he has no expertise of any sort

 8    whatsoever.

 9              Just because he does this stuff doesn't mean that I

10    am going to take him as a competent in lieu of the debtor.

11              MR. SCHOLL:  Well --

12              THE COURT:  Which part of that don't you get, Mr.

13    Scholl?

14              MR. SCHOLL:  I know of no rule, law, case --

15              THE COURT:  I know of no basis --

16              MR. SCHOLL:  -- that says that somebody has to be a

17    professional person to be able to help their parents.

18              THE COURT:  I know of no basis for putting him on the

19    stand.  You give me a basis for putting him on the stand.

20              MR. SCHOLL:  He can explain --

21              THE COURT:  Give me a legal basis.

22              MR. SCHOLL:  -- what has been going on with this

23    property because he has --

24              THE COURT:  What's the basis for that?

25              MR. SCHOLL: -- been delegated by his mother to handle

M. Santiago                                    99

1  it, and his father.

2          THE COURT:  Do you have a delegation?

3          MR. SCHOLL:  Do I have an official document?

4          THE COURT:  Are you giving me one?

5          MR. SCHOLL:  No, and I don't think it's necessary.

6  But could one be produced?  It could be, I suppose.

7          THE COURT:  Mr. Scholl, give me a legal basis that

8  allows him to testify.  I'm not --

9          MR. SCHOLL:  Any witness can testify.  There are

10 whole bunch of people that came in here and testified, I don't

11 know who --

12         THE COURT:  He's going to testify to what the

13 debtor's going to do in this case.  I'm not going to hear that.

14 I want to hear that from a debtor.

15         MR. SCHOLL:  If the debtor's delegated somebody else

16 to do it --

17         THE COURT:  He -- the debtor doesn't get to delegate

18 the bankruptcy case to another person, Mr. Scholl.  They may

19 able to construction work, they may be able to delegate lots of

20 things.  They don't get to delegate the bankruptcy case.

21         MR. SCHOLL:  Excuse me.

22                      (Pause)

23         MR. SCHOLL:  Well, she points out to me that it's

24 been mentioned that he has a power of attorney for his father.

25 I haven't seen it, I didn't ask for it.  His father was not the

M. Santiago                                      100

1  debtor either.

2          THE COURT:  Yeah, and I understand the father's not

3  competent, he's sick.

4          MR. SCHOLL:  He's competent but he -- he is --

5          THE COURT:  Well, no --

6          MR. SCHOLL:  He's aged.

7          THE COURT:  Nobody's told me whether he's competent

8  or not, you're right.  I know he's sick, and he can't be here.

9          MR. SCHOLL:  Right.

10         THE COURT:  And I'll listen to her.

11         MR. SCHOLL:  Well, he could be here.

12         THE COURT:  I ain't listening to him.  It's as simple

13 as that, Mr. Scholl.

14         MR. SCHOLL:  All right.  I -- I -- well, I don't know

15 what to say.  I mean obviously I'll follow the Court's rulings,

16 you know.

17         THE COURT:  I mean I just -- I know of no basis to

18 allow him to get up here and testify.

19         MR. SCHOLL:  I don't think you have to be a

20 professional person just to --

21         THE COURT:  Why don't you let me hear from Ms.

22 Thurmond with regard to her objection to it?  Maybe she has

23 less objection to him than I do.

24         MR. SCHOLL:  I'll be glad to hear whatever she has to

25 say.

M. Santiago                    101

1            MS. THURMOND:  So, Your Honor, it would be the City's

2   position that this is -- as Mrs. Santiago has said, this is her

3   son.  The property is owned -- that is at issue and is really

4   the heart of this case is owned by Mrs. Santiago and her

5   husband who -- he may be sick, but he's not here --

6            THE WITNESS:  (Indiscernible).

7            MS. THURMOND:  Sir.

8            THE COURT:  You need to stop talking or I will put

9   you out again, and we won't have to worry about --

10           THE WITNESS:  Because you wouldn't --

11           THE COURT:  Would you rather not testify?

12           THE WITNESS:  You wouldn't listen to me anyway

13   because you don't want to hear what I have to say anyway, so --

14           THE COURT:  All right.  Sir --

15           FEMALE SPEAKER:  Mr. Santiago, stop.

16           THE COURT:  I'm sorry.  Mr. Santiago, you really

17   don't want to do this.

18           THE WITNESS:  Okay.

19           MS. THURMOND:  So it's the City's position he's

20   really a non-party.  He is not the property owner, he's not the

21   property owner, he's not the debtor's -- the heart of the

22   City's motion is this is a bad faith filing by the debtor.

23   This is a bad faith filing to prevent the conservatorship

24   trial.

25           It really turns on what the debtor's intention is in

M. Santiago                                        102

1  this bankruptcy.  I think the person to speak to that is Mrs.

2  Santiago.  I mean she was on the stand.  I know it was

3  difficult because of the language barrier, and I tried the best

4  I could, and I know that she tried the best she could to listen

5  to the questions, and we got through it.  I just don't think

6  it's appropriate for a non-party who has no interest in this

7  bankruptcy case to be testifying.

8          Mrs. Santiago is right here.  She can get on the

9  stand and answer whatever questions Mr. Scholl has.

10          MR. SCHOLL:  She couldn't do it nearly as well as her

11  son because she's delegated to her son.  There's nothing wrong

12  with that, and he doesn't have to be a professional person.  He

13  doesn't have to be a lawyer or an architect to be able to do

14  things on her behalf.

15          THE COURT:  He doesn't, but he has to be -- he has to

16  be a reasonable facsimile that's -- that's my debtor, and my

17  debtor's sitting right here.  I don't need another party.  If

18  you have questions, you can ask Mrs. Santiago.

19          MR. SCHOLL:  Well --

20          THE COURT:  Let me be very clear, Mr. Scholl --

21          MR. SCHOLL:  I don't think it would be very

22  effective.

23          THE COURT:  -- this whole case is about whether or

24  not your clients actually intend to do anything with this

25  property, or whether this is just yet another attempt on their

M. Santiago                                103

1  part to evade the City fines, etc.  And that's what we have to

2  figure out.

3          And I could only figure it out if I can hear from her

4  as to what she's doing.  I heard two different stories today as

5  to what's happening here, and I'd like to know which one's

6  true.

7          MR. SCHOLL:  Okay.  I don't know if I could break it

8  down into two different stories, but okay.  Whatever.  The only

9  thing I could tell you is this.  There's been no evidence that

10 there was any problem with a prior case that these -- same

11 woman filed.  The same -- the same situation.

12         THE COURT:  Understood.

13         MR. SCHOLL:  I was not counsel.

14         THE COURT:  Understood.

15         MR. SCHOLL:  But -

16         THE COURT:  There was no evidence -- there was no

17 evidence as to any problems with the prior Chapter 13, you're

18 absolutely correct.

19         MR. SCHOLL:  The only thing we know is it was

20 confirmed without an objection.

21         THE COURT:  The argument that they're making is that

22 the bad faith arises from the prior activities with the

23 Santiagos and the City, not from prior bankruptcies, that's not

24 their argument.

25         MR. SCHOLL:  Well, maybe that's -- I -- I -- I'm not

1    sure what it is, but you may be right.  Maybe that's more of

2    their argument.  But they paid over $50,000, they didn't mind

3    accepting that --

4              MS. THURMOND:  Your Honor --

5              MR. SCHOLL:  -- you know?

6              MS. THURMOND:  This is not time for a closing

7    argument.

8              THE COURT:  I understand.

9              MR. SCHOLL:  Excuse me?  I couldn't hear that.

10             THE COURT:  Mr. Scholl, she was just suggesting that

11   we aren't going to be -- we aren't engaged in closing argument

12   at this point.

13             MR. SCHOLL:  Well --

14             THE COURT:  So I -- here's what I'm telling you, Mr.

15   Scholl:  Put Mrs. Santiago on the stand.

16             MR. SCHOLL:  I can try.

17             THE COURT:  Okay.

18             MR. SCHOLL:  f you insist.

19             THE COURT:  All right.

20             MR. SCHOLL:  Mrs. Santiago --

21             THE COURT:  Mr. Santiago, you may step down.

22             Mrs. Santiago, if you'll come back up here.  Please

23   remember that you've already been sworn.

24             MRS. SANTIAGO:  I don't -- excuse me, Your Honor --

25             MR. SCHOLL:  Ms. Santiago --

1              MRS. SANTIAGO:  Excuse me, Your Honor.

2              MR. SCHOLL:  -- you're going to have to go up there.

3              MRS. SANTIAGO:  Excuse me, Your Honor.

4              MR. SCHOLL:  Whether you like it or not.

5              MRS. SANTIAGO:  I give you the permit to my son, is

6  my son.  Is my son.

7              THE COURT:  I don't -- Mrs. Santiago --

8              MRS. SANTIAGO:  Is my son.  I -- is my son --

9              THE COURT:  Mrs. Santiago, you --

10             MRS. SANTIAGO:  You hear, he -- he know English --

11             THE COURT:  If you don't want me to dismiss your case

12 immediately --

13             MRS. SANTIAGO:  He know English -- (indiscernible)

14 say something -- say something that is not supposed to say it

15 and simply in writing and then I go to be in trouble with the -

16 - with this --

17             THE COURT:  Mr. Scholl --

18             MRS. SANTIAGO:  You not want him --

19             THE COURT:  -- if your client is not quiet, I will,

20 in fact, dismiss the case.

21             MRS. SANTIAGO:  What I saying is -- Your Honor --

22             MS. BLOOM:  Your Honor, could we have a brief recess?

23             MRS. SANTIAGO:  -- okay --

24             MR. SCHOLL:  She's very upset.

25             MRS. SANTIAGO:  Because --

1          THE COURT:  You better -- if you can get her out of

2  here --

3          MRS. SANTIAGO:  (Indiscernible) she says something

4  that I don't understand I say yes, I say no --

5          MR. SCHOLL:  Walk her out of the courtroom.

6          MRS. SANTIAGO:  That's the problem, that's why I have

7  my son.

8          THE COURT:  Mrs. Santiago --

9          MRS. SANTIAGO:  He's my son.

10         THE COURT:  Mrs. Santiago, listen to me.  If you do

11  not stop right now --

12         MRS. SANTIAGO:  Okay.  I'm gonna stop it, but I can -

13  -

14         THE COURT:  -- I am going to dismiss your case, which

15  is not what you want to happen.

16         MR. SANTIAGO:  You're probably going to do it anyway.

17         THE COURT:  So go out in the hall and get quiet.  Go

18  ahead, have a seat, do whatever you want.

19         MR. SCHOLL:  If we could have a short recess.

20         MS. THURMOND:  How long of a recess would Your Honor

21  like?

22         MS. BLOOM:  Five minutes, please?

23         THE COURT:  Certainly long enough for a comfort

24  break, but that's it.  You guys get five minutes, and that's

25  it.

1          MS. THURMOND:  Very good, Your Honor.

2

3              (Recess 4:21 p.m./Reconvene 4:28 p.m.)

4          MS. THURMOND:  Do you have a morning -- oh, your list

5    is now Wednesday.

6          THE COURT:  Um?

7          MS. THURMOND:  Your -- your Chapter 13 list is now

8    Wednesday.

9          THE COURT:  Is now Wednesday.  So we could do it at

10   9:30 on either morning, either day.  The 24th or the 31st.

11         MS. THURMOND:  I have Chapter 13 matters, but I could

12   find somebody else in my office to cover them.

13         MR. BIELLI:  Um --

14         MR. SCHOLL:  The 31st is better for me, Your Honor.

15         THE COURT:  Okay.  Mr. Santiago, are you okay on the

16   31st?  You and your mom okay on the 31st?

17         MR. SANTIAGO:  31st is good, too.

18         MRS. SANTIAGO:  Yeah, 31st.

19         THE COURT:  Okay.  Hang on, we're checking with

20   everybody else.

21         MR. BIELLI:  I have no preference.

22         MR. SCHOLL:  Well --

23         MRS. SANTIAGO:  And the 31st, Your Honor, and my son

24   can speak that time?

25         THE COURT:  Talk to your counsel.

1            MR. SCHOLL:  Well, my wife indicates that she --

2    she's not available on the 31st, and I'd like her to be here.

3            THE COURT:  Okay.  Are we back to the 24th?  Does

4    that work for everybody, too?

5            MR. BIELLI:  24th works for my end, Judge.

6            MR. SCHOLL:  Do you have any other date?

7            THE COURT:  24th work for you all?

8            MR. SANTIAGO:  No, it doesn't.

9            THE COURT:  Oh.  Okay, I think we're going to have to

10   do without your wife, Mr. Scholl, okay?  May 31st at 9:30.

11           MS. BLOOM:  Yes, Your Honor.

12           THE COURT:  If there are any exhibits, please be here

13   by 9 o'clock to have them marked.

14                          (Pause)

15           THE COURT:  If there's a problem with the interpreter

16   on that date, Mr. Scholl, notify the other parties and then get

17   a hold of Joan.

18           MS. BLOOM:  Your Honor, one minor housekeeping issue.

19   I understand that Mr. Scholl has a hearing date on for this

20   Wednesday at 9:30 relating to an extension of the automatic

21   stay.  Will that hearing go forward, or will we put it all over

22   until the continued hearing date on the 31st?

23           THE COURT:  That hearing would have to go forward,

24   because otherwise he loses his stay, so --

25           MS. BLOOM:  Understand.

1          THE COURT:  -- he'll have to at least -- he'll have

2    to at least have the hearing.  I don't know -- have there be

3    any extensions filed to the extension of the stay?

4          MR. SCHOLL:  No, Your Honor, although it -- there's

5    kind of a short period because the date -- there's only about

6    12 days' time, so I couldn't file a certification of no

7    objection.

8          THE COURT:  No, no, I mean if the -- there's enough

9    time.  He's given enough time.  Yeah, so no, we don't need an

10   adjournment.  If somebody shows up and objects, we'll deal with

11   the objection.  If they don't show up and object, we'll enter

12   the order.

13         MR. SCHOLL:  All right.  So I don't need an

14   interpreter for Wednesday, is that right?

15         THE COURT:  I can't -- Mr. Bielli, speak.

16         MR. BIELLI:  I think we're objecting, Your Honor.

17         THE COURT:  You think you're objecting, all right.

18   So we've got --

19         MS. BLOOM:  We will be, yes.

20         MR. BIELLI:  We will be objecting is what Ms. Bloom's

21   telling me.

22         MS. THURMOND:  And I would note for Your Honor that

23   the date for which people to file objections is the hearing

24   date, so --

25         THE COURT:  I don't recollect all of the premises

1  that were stated, so what I would ask is that you all talk to

2  Mr. Scholl with regard to what your objection is so that he can

3  be comfortable.  Or you can either agree that you're willing to

4  accept the arguments that he's -- that are made in the motion

5  without further testimony, but that your argument doesn't

6  matter, that you still think it shouldn't be granted.  Okay, so

7  you all will talk.

8              MR. SCHOLL:  We'll talk, Your Honor.

9              THE COURT:  All right.

10             MS. THURMOND:  Thank you, Your Honor.

11             MS. BLOOM:  Yes, Your Honor; thank you.

12             THE COURT:  Very good.

13             MR. BIELLI:  What's that, Your Honor?  If --

14             THE COURT:  If, in fact, we need to -- we -- hello,

15 everybody?  If, in fact, we do need an interpreter for that

16 hearing, then let Joan know, we'll cancel that, we'll do an

17 interim order granting it, and moving it to the 31st.

18             MR. SCHOLL:  All right.

19             THE COURT:  Okay?

20             MR. SCHOLL:  Okay.

21             THE COURT:  But we'll do an interim order that will

22 grant it through the order on the 31st.

23             MR. SCHOLL:  All right.  We'll see --

24             MR. BIELLI:  May I, Judge?  Can we agree on an

25 interim order now?  It's one -- I think it's one day, Your

1  Honor.

2          MR. SCHOLL:  Well, I don't know if it's one day, but

3  I -- if he wants to agree that's fine.

4          MS. THURMOND:  The City would also agree to entering

5  an order which would give -- extend the stay to the date of the

6  hearing on the 31st.

7          THE COURT:  That's -- that's what our interim order

8  stated.

9          MS. BLOOM:  Yes.

10          MS. THURMOND:  Yes; I'm sorry, Your Honor.  It's late

11  in the day.

12                          (Laughter)

13          THE COURT:  I understand.

14          MR. BIELLI:  Not an interim order, just a bridge

15  order would be better.

16          THE COURT:  I understand, all right.  So, Joan, we

17  will do an interim order.  You don't have to even come at all

18  on Wednesday; how is that?

19          MR. SCHOLL:  All right.

20          THE COURT:  Life is good.

21          MR. SCHOLL:  Okay; thank you, Your Honor.

22          THE COURT:  All right?  I will see you all on the

23  31st.

24          MS. BLOOM:  Thank you, Your Honor.

25          MS. THURMOND:  Thank you, Your Honor.

1             THE COURT:  Thank you.  Don't wait for me because

2  I've got paperwork and stuff to do here, so -- make sure I've

3  got everything.

4             MS. THURMOND:  (Indiscernible - not at microphone).

5             THE COURT:  What I'm going to do --

6             MS. THURMOND:  Sure, I have --

7             THE COURT:  What we're going to do, Ms. Thurmond,

8  we'll give them -- we're going to give them all back to you.

9             MS. THURMOND:  I'm sorry.  Ms. Jackson was also

10 speaking.

11            THE COURT:  That's all right.  No, we're going to

12 give them all back to you, and then if you -- when you come

13 back on the 31st, if you'd bring us versions that have only the

14 ones that have been admitted.

15            MS. THURMOND:  Oh, that's a very good solution,

16 rather than having to do it right now.

17            THE COURT:  Exactly.

18        (Whereupon, at 4:34 p.m., the hearing was adjourned.)

19

20

21

22

23

24

25

113

1

2

3

4                         <u>CERTIFICATE OF TRANSCRIBER</u>

5

6        I, KAREN HARTMANN, a certified Electronic Court

7   Transcriber, certify that the foregoing is a correct transcript

8   from the electronic sound recording of the proceedings in the

9   above-entitled matter.

10

11

12

13

14   Karen Hartmann, AAERT CET**D0475 Date:  July 17, 2018

15   TRANSCRIPTS PLUS, INC.

16

17

18

19

20

21

22

23

24

25

**TRANSCRIPTS PLUS, INC.**
**PHONE 215-862-1115 ● FAX 215-862-6639 ● E-MAIL CourtTranscripts@aol.com**